IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
May 30, 2013 Session Heard at Nashville[1]

# ANDREW K. ARMBRISTER v. MELISSA H. ARMBRISTER

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Chancery Court for Greene County**
**No. 20080341      Thomas R. Frierson, II, Chancellor**

---

## No. E2012-00018-SC-R11-CV - Filed October 21, 2013

---

The issue in this post-divorce proceeding is whether a parent seeking to modify a residential parenting schedule in a permanent parenting plan must prove that an alleged material change in circumstances could not reasonably have been anticipated when the residential parenting schedule was originally established. We hold that Tennessee Code Annotated section 36-6-101(a)(2)(C) (2010), enacted in 2004, abrogated any prior Tennessee decision that could have been read as requiring such proof. Accordingly, because the father who sought modification in this case was not required to prove that his remarriage, relocation, changed work schedule, and natural aging of his children were unanticipated, we reverse the Court of Appeals' judgment and reinstate the trial court's judgment modifying the residential parenting schedule to give the mother 222 days and the father 143 days of residential parenting time with the two minor children.

### Tenn. R. App. P. 11 Appeal by Permission;
### Judgment of the Court of Appeals Reversed; Judgment of the Trial Court
### Reinstated

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Thomas C. Jessee, Johnson City, Tennessee, for the appellant, Andrew K. Armbrister.

David L. Leonard, Greeneville, Tennessee, for the appellee, Melissa H. Armbrister.

---

[1] Oral argument was heard in this case on May 30, 2013, at Lipscomb University in Nashville, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

**OPINION**

**I. Factual and Procedural History**

The facts of this case are largely undisputed. Andrew Armbrister ("Father") and Melissa Armbrister ("Mother"), both dentists, married on June 10, 2000, and moved across Tennessee, from Columbia to Greeneville. Father purchased a 50% interest in a dentistry practice, and Mother worked in another Greeneville dentist's office. The couple had two children, a son, born August 28, 2006, and a daughter, born December 1, 2008.

Less than a month after their daughter's birth, on December 23, 2008, Father filed for divorce. Mother filed a counter complaint for divorce on January 20, 2009. A temporary parenting arrangement was established.[2] The matter was tried on August 24, 2009. On September 2, 2009, the trial court issued a memorandum opinion granting Mother a divorce and allocating parental responsibilities.[3]

The trial court, considering the various factors enumerated in the relevant statutes, found that both parents had loving and emotional ties with the children and were "appropriately disposed" to provide the children with food, clothing, education, medical, and other care. The trial court determined that Mother's home was stable and secure and that she had manifested an ability to instruct and encourage the children to prepare them for success in life and society. The trial court found that Mother had been "the primary caregiver for the children and had taken the greater responsibility for performing parental responsibilities" during the marriage and "particularly following the parties' separation." On the other hand, the trial court found that Father had "spent considerable portions of his recreational time traveling and playing golf" during the marriage. Because the parties separated shortly after the birth of their daughter, the trial court further found that Father had "spent limited co-parenting time" with his daughter.

Based on these findings, the trial court adopted a Permanent Parenting Plan ("PPP"), which named Mother as the primary residential parent and granted her sole decision-making authority for the children regarding education, non-emergency health care, religious

---

[2] The record on appeal does not include a copy of the temporary parenting plan, but Father referred to the agreement in a motion to reconsider that appears in the record and in his testimony on his motion to modify the trial court's final judgment in the divorce proceeding. Neither the motion nor Father's testimony provides the details of the temporary parenting arrangement.

[3] The September 2, 2009 memorandum opinion also addressed child support, the equitable division of marital assets, spousal support, attorney's fees, and costs, but none of these issues is relevant to the present appeal.

upbringing, and extracurricular activities.  The residential parenting schedule provided for Father to exercise parenting time with the children: (1) every other weekend from 6:00 p.m. on Friday to 6:00 p.m. on Sunday; (2) every other Wednesday from 5:00 p.m. to 8:00 p.m.; (3) alternating holidays and school breaks; and (4) two non-consecutive weeks in the summer months. Overall, the residential parenting schedule allocated 280 days to Mother and 85 days to Father.  Father's child support obligation was set at $2,014 per month.

On September 25, 2009, the trial court entered a final judgment of divorce, which incorporated the September 2, 2009 memorandum opinion and PPP. On September 30, 2009, Father filed a motion to reconsider, arguing, among other things, that the trial court erred by affording him less time under the PPP than he had received between the filing of the divorce complaint and the trial of the matter under the temporary parenting arrangement.  On February 17, 2010, the trial court denied Father's motion to reconsider.  Father did not appeal.

Almost one year later, on February 11, 2011, Father filed a one-paragraph motion[4] to modify the PPP due to changed circumstances.  Father alleged that he had remarried, that his work schedule had changed, that Mother had been unwilling to allow any modification of the visitation schedule, and that mediation had been attempted unsuccessfully. Father requested equal parenting time with the children.  On March 25, 2011, Mother filed a response, asking the trial court to dismiss the motion based on Father's failure to allege "an unanticipated substantial and material change in circumstances justifying modification of the parties' [PPP]."

By the time of the October 13, 2011 hearing on the motion, the parties' son was five years old and their daughter was almost three years old.  Mother, testifying first, stated that the PPP had worked well and should not be changed because the children were well-adjusted and stable.  Mother explained that she had been surprised that the PPP functioned so well because she initially believed it gave Father "a lot more quality time" with the children than he had spent with them during the marriage.

Mother, whose work schedule had not changed since the PPP was adopted, worked three days per week, Tuesday through Thursday, from 8:30 a.m. to 5:00 p.m.  During this time, the children stayed at a daycare center.  Mother usually drove them to and from the daycare center, but the children's maternal grandmother drove them to daycare at 9:00 a.m. and picked them up at 3:00 p.m. whenever the maternal grandmother visited Mother and the

_____

[4] Tennessee Code Annotated section 36-6-405 (2010) appears to require the filing of a petition for modification rather than a motion as the initial pleading in this situation.  However, neither party has raised this issue, and it is not before us in this case.

children. Mother acknowledged that she relied on the maternal grandmother, instead of Father, to transport the children to and from daycare and to care for the children on the rare occasions Mother had been away from home overnight since the divorce. Mother testified that, although she ordinarily consulted Father regarding decisions about the children's education and extracurricular activities and although no disagreements had arisen, she preferred to retain sole decision-making authority regarding such matters to avoid potential future disagreements.

Mother disagreed with Father's allegation that she had been inflexible or unwilling to allow him parenting time in addition to that provided by the residential parenting schedule. Mother introduced a January 5, 2011 email by which she had agreed to Father's requests to switch one weekend and one Wednesday and had also agreed to allow the children to spend an extra night with Father near his birthday. Mother testified that she allows Father to pick up the children earlier than the residential parenting schedule requires when he and the children are traveling out of town. Mother further stated that she had already agreed to allow Father three additional hours on October 27, 2011, about two weeks after the hearing, so the children could attend a Halloween party at his country club.

Despite her disagreement with some of Father's allegations, Mother testified that she and Father get along well. To illustrate, Mother introduced a text message Father sent her on May 8, 2011, which stated: "I just wanted to tell you happy birthday and let you know that I think you're an amazing mother to our children and I hope you have a great day tomorrow." Although Father had a relationship with his current wife during his marriage to Mother, Mother stated that she and Father's current wife get along "amazingly well." Mother testified that Father's current wife has "been good with the kids," and Mother agreed that the children also get along well with their stepmother. In Mother's opinion, the PPP had "completely" and "definitely" allowed the children to establish a positive relationship with their stepmother.

Testifying next, Father explained that, after the divorce was finalized, he relocated his dental practice and moved in June 2010 from Greeneville to Jonesborough. He now owns a residence about thirty minutes from Mother's home. Father stated that he married Erica Bray Armbrister ("Mrs. Armbrister") on October 16, 2010, and that she had developed a "great relationship" with the children. As an example, Father said that Mrs. Armbrister "enjoy[ed] doing educational things" with his five-year-old son, such as helping him learn to read and write, and that she and his daughter get "along great."

To support his request for modification, Father reiterated the changes that have occurred since the PPP was adopted, including: (1) his remarriage; (2) Mrs. Armbrister's becoming a willing and participating stepparent; (3) his relocation from a rental property in

-4-

Greeneville to his own home in Jonesborough; (4) the changes in his work schedule, including greater flexibility to spend time with the children since the sale of his interest in the Greeneville dentistry practice and purchase of his own dentistry practice in Johnson City; and (5) the increased age of the children, which Father viewed as very significant, pointing out that his son was three years old and his daughter not quite one year old when the PPP was adopted.

Father emphasized that he had participated fully in his children's extracurricular activities since the PPP was adopted, explaining that he had attended his son's soccer, basketball, and flag football games, served as a "team parent" for his son's T-ball team, and coached his son's T-ball team. Father expressed his intent to participate in his daughter's extracurricular activities as well, explaining that she will begin dance as soon as she is fully potty trained.

Father agreed that he and Mother had gotten along well since the PPP was adopted. He also agreed that Mother had allowed him additional time with the children when he had asked and she was going out of town. He acknowledged that she had also allowed him "a few extra hours" with the children at the beginning or end of weekend visitation, as well as "a little leeway here and there" for vacation. Father additionally stated that, "from the get-go," Mother had allowed him to pick up the children early for his bi-weekly Wednesday parenting time because he did not work on Wednesday afternoons. However, he emphasized that Mother had only allowed him extra parenting time when he asked for it and had not otherwise offered him extra opportunities to care for the children when she was working or out of town.

On cross-examination, Father agreed with Mother's counsel that the PPP had enabled him and Mrs. Armbrister to develop a "fantastic" relationship with the children. When asked whether he had testified during the divorce trial "that there was a chance [he] would have to move," Father responded, "I think so." Father stated that he had not been looking at other dentistry practices at the time of the divorce trial, but he agreed he had begun looking "shortly after" the trial. As to his work schedule, Father stated that he had worked "a lot more Fridays" before moving his dentistry practice from Greeneville to Johnson City.

Father agreed that he and Mrs. Armbrister get along well with Mother, whom Father described as "a great Mom." Father also agreed that the children are "for the most part" well-adjusted and that he and Mother both have stable homes. Father acknowledged being dissatisfied with the PPP from the time of its adoption, explaining that his dissatisfaction stemmed from the fact that he received less parenting time under the PPP than under the temporary parenting arrangement. Father acknowledged as well sending Mother an email

expressing his dissatisfaction.[5]  Nonetheless, Father reiterated his assertion that a material change in circumstances had occurred that warranted modification of the PPP.

Mrs. Armbrister, the final witness at the hearing, testified that she gets along well with the children and enjoys being with them because "[t]hey're fun."  Mrs. Armbrister believed that she and the children had adapted well to each other.  She described Mother as "very nice" and stated that she and Mother get along "very well."  Mrs. Armbrister testified that she attends and photographs her stepson's T-ball games, and she expressed her desire to spend more time with the children.  Mrs. Armbrister stated that she is willing and ready to participate in the children's educational and extracurricular activities and "all the things" that come with being a stepparent.

At the conclusion of the hearing, the trial court took the case under advisement.  On November 9, 2011, the trial court issued a comprehensive, nine-page memorandum opinion, accompanied by a new PPP.  The memorandum opinion included a thorough analysis of the applicable statutes and appellate decisions.  The trial court found that Mother and Father had maintained a positive, cooperative relationship with one another regarding their parenting responsibilities, even though they occasionally had differences of opinion on certain matters.  Both parents, the trial court further found, had loving and emotional ties with the children and were disposed to provide the children with food, clothing, medical care, education, and other necessities.

The trial court found that: (1) Father relocated his dentistry practice and his residence in June 2010; (2) Father remarried in October 2010; (3) Mother and Father reside about thirty minutes apart; (4) Mrs. Armbrister has a close relationship with the children and a positive relationship with Mother; (5) both parents have stable, secure, and healthy homes; (6) the children are happy and well-adjusted; (7) the children are involved in various extracurricular activities; and (8) Father coaches his son's T-ball team.  Based on these findings, the trial court concluded that Father had satisfied his burden of proving a change in circumstances[6] and that modifying the residential parenting schedule of the PPP would serve the children's best

_____

[5] In a November 10, 2010 email to Mother, Father stated: "I'm not threatening you with anything.  I'm sorry that you're taking it that way.  But take this how you want to.  I will not stop taking you to mediation/court until I have more time with the children and an equal say in their education, religious upbringing and medical treatment."

[6] Tennessee courts and the Tennessee General Assembly use the terms "material change in circumstances" and "material change of circumstances" interchangeably. While these terms refer to the same concept, we will utilize the term "material change in circumstances," consistent with prior decisions. See, e.g., Kendrick v. Shoemake, 90 S.W.3d 566, 570 (Tenn. 2002).

-6-

interests.[7]  As a result, the trial court modified the residential parenting schedule to provide Mother 222 days and Father 143 days of parenting time with the children.  The modified residential parenting schedule permits Father to exercise parenting time with the children: (1) from 3:00 p.m. on Friday to 8:00 a.m. on Monday every other weekend; (2) from 3:00 p.m. on Wednesday to 8:00 a.m. on Thursday bi-weekly; (3) alternating holidays and school breaks; and (4) four non-consecutive weeks during the summer months.  Under the modified PPP, Mother retains sole decision-making authority for the children regarding education, non-emergency health care, religious upbringing, and extracurricular activities.  Based on his increased time with the children, the trial court reduced Father's child support obligation to $1,639 per month and ordered each party to pay his or her attorney's fees.  On December 20, 2011, the trial court entered a final judgment adopting the November 9, 2011 memorandum opinion and modified PPP.

Mother appealed and raised a single issue: whether the trial court erred in finding that a material change in circumstances had occurred which justified a modification of the initial PPP.[8]  Father raised no other issues on appeal.

In a divided opinion, the Court of Appeals reversed the trial court's judgment. Armbrister v. Armbrister, No. E2012-00018-COA-R3-CV, 2012 WL 3060509 (Tenn. Ct. App. July 27, 2012).  The Court of Appeals majority concluded that Father's relocation from Greeneville to Jonesborough was not significant because his residence remained only thirty minutes from Mother's home.  Id. at *3.  The majority also concluded that Father's move "was not unanticipated" because Father "testified at the original divorce trial that he might move."  Id.  The Court of Appeals majority noted that no proof had been offered to show that Father's relocation: (1) caused the children to spend too much time in transit; (2) prevented Father from participating in the children's activities; or (3) precluded Father from spending significant time with the children.  The majority thus concluded that Father had failed to establish that the move "was a material and unanticipated change which affected the children in a meaningful way."  Id.  The majority acknowledged Father's testimony that he had worked fewer Fridays since the move, but nonetheless concluded that Father's "work schedule had not changed significantly."  Id.  Father's remarriage also did not amount to a material change in circumstances, the majority concluded, because: (1) the record lacked proof showing that

_____

[7] The trial court also found that the changes in circumstances were not sufficiently significant to warrant modifying the PPP's designation of Mother as the primary residential parent.  Father has not appealed the trial court's finding on this issue.

[8] The record does not include either a motion requesting a stay of the trial court's judgment adopting the modified PPP pending appeal or an order staying the judgment pending appeal.  Additionally, in the brief filed in the Court of Appeals, Father stated that "no stay of the order was requested and the parties have been living by the modified parenting plan since it was entered on November 9, 2011."

Mrs. Armbrister "had 'changed the home environment' in a significant way"; and (2) the remarriage "was not an unanticipated change, since [Father] was dating his future wife when he and [Mother] divorced." Id.

Judge Charles D. Susano, Jr. dissented and would have affirmed the trial court's "well-reasoned decision." Armbrister, No. E2012-00018-COA-R3-CV, slip op. at *2 (Tenn. Ct. App. July 27, 2012) (Susano, J., dissenting). Judge Susano did "not believe the trial court went outside the parameters of its sound discretion when it increased [Father's] co-parenting time from 85 to 143 days." Id. at *1. Judge Susano disagreed with the majority's conclusion that Father's relocation and remarriage reasonably could have been anticipated at the divorce trial. Judge Susano also viewed Father's remarriage as a particularly significant *positive* change in circumstances which was instrumental in fostering Father's continuing good relationships with Mother and the children.

We granted Father's Tennessee Rule of Appellate Procedure 11 application for permission to appeal.

## II. Standards of Review

In this non-jury case, our review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. See Tenn. R. App. P. 13(d); In re C.K.G., 173 S.W.3d 714, 732 (Tenn. 2005); Kendrick, 90 S.W.3d 566, 570 (Tenn. 2002); Hass v. Knighton, 676 S.W.2d 554, 555 (Tenn. 1984). We review the trial court's resolution of questions of law de novo, with no presumption of correctness. Kendrick, 90 S.W.3d at 569. Statutory interpretation is a question of law, which we review de novo. Mills v. Fulmarque, 360 S.W.3d 362, 366 (Tenn. 2012).

A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions. See In re T.C.D., 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings. See Tenn. R. App. P. 13(d); In re C.K.G., 173 S.W.3d at 732; Kendrick, 90 S.W.3d at 570; Hass, 676 S.W.2d at 555.

Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, Holloway v. Bradley, 230 S.W.2d 1003, 1006 (Tenn. 1950); Brumit v. Brumit, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are

better positioned to evaluate the facts than appellate judges. Massey-Holt v. Holt, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge.'" Suttles v. Suttles, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting Edwards v. Edwards, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." Eldridge v. Eldridge, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. Id. "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." Gonsewski v. Gonsewski, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." Eldridge, 42 S.W.3d at 88.

## III. Analysis

### A. Establishing an Initial Permanent Parenting Plan

At the time of a divorce, or in any other Tennessee proceeding "where the custody of a minor child or minor children is a question," Tenn. Code Ann. § 36-6-101(a)(1), the court must "make a custody determination," id. § 36-6-106(a) (2010 & Supp. 2013). The statutory requirements applicable to that determination are derived from a number of separate Code sections, which are not a model of clarity.

The General Assembly has declared that the overarching "standard by which the court determines and allocates the parties' parental responsibilities" after divorce is the "best interests of the child." Id. § 36-6-401(a) (2010); see also id. § 36-6-106(a) (2010 & Supp. 2013) (stating that custody determinations "shall be made on the basis of the best interest of the child"); Luke v. Luke, 651 S.W.2d 219, 221 (Tenn. 1983) (stating that for courts adjudicating child custody and visitation disputes, "the welfare of the child has always been the paramount consideration"); Holloway, 230 S.W.2d at 1006 ("The supreme rule to which all others should yield is the welfare and best interest of the child."). "In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child," Tenn. Code Ann. § 36-6-106(a) (Supp. 2013), consistent with ten enumerated factors, id. § 36-6-106(a)(1)–(10)

(2010 & Supp. 2013),[9] as well as "the location of the residences of the parents, the child's

---

[9] Section 36-6-106(a) provides:

The court shall consider all relevant factors, including the following, where applicable:
(1) The love, affection and emotional ties existing between the parents or caregivers and the child;
(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;
(4) The stability of the family unit of the parents or caregivers;
(5) The mental and physical health of the parents or caregivers. The court may, when it deems appropriate, order an examination of a party pursuant to Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party pursuant to § 33-3-105(3). The court order required by § 33-3-105(3) shall contain a qualified protective order that, at a minimum, expressly limits the dissemination of confidential protected mental health information for the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings.
(6) The home, school and community record of the child;
(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;
(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;
(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;
(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and
(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In

(continued...)

-10-

need for stability and all other relevant factors." Id. § 36-6-106(a) (Supp. 2013).

The General Assembly has made the following additional findings regarding parenting arrangements.

> The [G]eneral [A]ssembly recognizes the detrimental effect of divorce on many children and that divorce, by its nature, means that neither parent will have the same access to the child as would have been possible had they been able to maintain an intact family. The [G]eneral [A]ssembly finds the need for stability and consistency in children's lives. The [G]eneral [A]ssembly also has an interest in educating parents concerning the impact of divorce on children. The [G]eneral [A]ssembly recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests. The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care.
> (b) The [G]eneral [A]ssembly finds that mothers and fathers in families are the backbone of this state and this nation. They teach children right from wrong, respect for others, and the value of working hard to make a good life for themselves and for their future families. *Most children do best when they receive the emotional and financial support of both parents.* The [G]eneral [A]ssembly finds that a different approach to dispute resolution in child custody and visitation matters is useful.

Id. § 36-6-401 (2010)(emphasis added).

In facilitating this different approach, more recently enacted parenting statutes have generally replaced the terms "custody" and "visitation" with the terms "[p]arenting

---

[9](...continued)
determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Id. § 36-6-106(a)(1)–(10) (2010 & Supp. 2013).

responsibilities," "[p]ermanent parenting plan," "[p]rimary residential parent," and "[r]esidential schedule."[10]  Id. § 36-6-402(2)–(5) (2010).

"Parenting responsibilities" refers to "those aspects of the parent-child relationship in which the parent makes decisions and performs duties necessary for the care and growth of the child."[11]  To allocate parenting responsibilities properly, the court must ensure that each permanent parenting plan designates a primary residential parent and establishes a residential parenting schedule.  Id. § 36-6-404(b) (2010).  "'Primary residential parent' means the parent with whom the child resides more than fifty percent (50%) of the time."  Id. § 36-6-402(4).

> "Residential schedule" is the schedule of when the child is in each parent's physical care, and it shall designate the primary residential parent; in addition, the residential schedule shall designate in which parent's home each minor child shall reside on given days of the year, including provisions for holidays, birthdays of family members, vacations, and other special occasions, consistent with the criteria of this part; provided, that nothing contained herein shall be construed to modify any provision of § 36-6-108 [the statute governing parental relocation.]

---

[10] We will use these terms as well in this opinion.

[11] Under Tennessee Code Annotated section 36-6-402(2)(A)–(F), "[p]arenting responsibilities," "the establishment of which is the objective of a permanent parenting plan," include:

> (A) Providing for the child's emotional care and stability, including maintaining a loving, stable, consistent, and nurturing relationship with the child and supervising the child to encourage and protect emotional, intellectual, moral, and spiritual development;
> (B) Providing for the child's physical care, including attending to the daily needs of the child, such as feeding, clothing, physical care, and grooming, supervision, health care, and day care, and engaging in other activities that are appropriate to the developmental level of the child and that are within the social and economic circumstances of the particular family;
> (C) Providing encouragement and protection of the child's intellectual and moral development, including attending to adequate education for the child, including remedial or other education essential to the best interests of the child;
> (D) Assisting the child in developing and maintaining appropriate interpersonal relationships;
> (E) Exercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances; and
> (F) Providing any financial security and support of the child in addition to child support obligations[.]

Id. § 36-6-402(2)(A)–(F) (2010).

-12-

Id. § 36-6-402(5).

Additionally, every final decree in a divorce action in Tennessee involving a minor child must incorporate a permanent parenting plan. Id. § 36-6-404(a). A "'[p]ermanent parenting plan' means a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule, as well as an award of child support consistent with chapter 5 of this title." Id. § 36-6-402(3).

Fashioning permanent parenting plans is one of the most important responsibilities courts have. See Massey-Holt, 255 S.W.3d at 607; Boyer v. Heimermann, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007). Courts performing this task must ensure that permanent parenting plans:

> (1) Provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for further modifications to the permanent parenting plan;
> (2) Establish the authority and responsibilities of each parent with respect to the child, consistent with the criteria in this part;
> (3) Minimize the child's exposure to harmful parental conflict;
> . . . .
> (5) Allocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing . . . .
> (6) Provide that each parent may make the day-to-day decisions regarding the care of the child while the child is residing with that parent; [and]
> (7) Provide that when mutual decision making is designated but cannot be achieved, the parties shall make a good-faith effort to resolve the issue through the appropriate dispute resolution process . . . .

Tenn. Code Ann. § 36-6-404(a)(1)–(9) (2010).

A residential schedule generally must be "consistent with the child's developmental level and the family's social and economic circumstances," and should "encourage each parent to maintain a loving, stable, and nurturing relationship with the child." Id. § 36-6-404(b).

Before forging a residential schedule, a court must first determine whether either parent has engaged in any of the misconduct specified in Tennessee Code Annotated section

36-6-406 (2010),[12] which necessitates limiting the parent's residential time with the child. Id. § 36-6-404(b). If section 36-6-406 does not apply, then a court crafting a residential schedule must consider fifteen specifically enumerated factors, as well as any other factors deemed relevant by the court, in order to determine how much time a child should spend with each parent.[13]

---

[12] None of the factors listed in this statute are at issue in this case.

[13] Tennessee Code Annotated section 36-6-404(b)(1)–(16) states:

If the limitations of § 36-6-406 are not dispositive of the child's residential schedule, the court shall consider the following factors:
(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;
(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;
(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;
(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;
(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;
(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;
(7) The love, affection, and emotional ties existing between each parent and the child;
(8) The emotional needs and developmental level of the child;
(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;
(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;
(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;
(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;
(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;
(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;
(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and
(16) Any other factors deemed relevant by the court.

(continued...)

Significant overlap exists between the factors a court must consider when establishing a residential schedule and the factors a court must consider when determining a child's best interests in the course of making an initial custody decision. <u>Compare</u> Tenn. Code Ann. § 36-6-404(b), <u>with</u> Tenn. Code Ann. § 36-6-106(a); <u>see also</u> <u>Burden v. Burden</u>, 250 S.W.3d 899, 908 n.5 (Tenn. Ct. App. 2007) (recognizing that the statutory criteria relevant to the residential schedule overlap with, and somewhat expand upon, the factors set out in section 36-6-106 relevant to determining custody); <u>Dobbs v. Dobbs</u>, No. M2011-01523-COA-R3-CV, 2012 WL 3201938, at *1 n.1 (Tenn. Ct. App. Aug. 7, 2012) ("There is little substantive difference between the factors applicable to parenting plans, set out in Tenn. Code Ann. § 36-6-404(b), and those applicable to custody determinations, set out in Tenn. Code Ann. § 36–6–106(a) as far as determining comparative fitness and the best interests of the child.").

### B. Modification of a Residential Schedule

Once a permanent parenting plan has been incorporated in a final divorce decree, the parties are required to comply with it unless and until it is modified as permitted by law. <u>See</u> Tenn. Code Ann. § 36-6-405 (2010). In assessing a petition to modify a permanent parenting plan, the court must first determine if a material change in circumstances has occurred and then apply the "best interest" factors of section 36-6-106(a). <u>Id.</u> § 36-6-101(a)(2)(B)–(C) (2010), -106(a) (2010 & Supp. 2013); <u>see also</u> <u>Kendrick</u>, 90 S.W.3d at 570; <u>Boyer</u>, 238 S.W.3d at 255. Finally, pursuant to the modification procedures described in section 36-6-405(a), the court must apply the fifteen factors of section 36-6-404(b), so as to determine how, if at all, to modify the residential parenting schedule. Just as the court's processes for determining the child's best interests and residential schedule when making its initial custody decisions overlap substantially, here again the two analyses are likely to be quite similar. <u>Compare</u> Tenn. Code Ann. § 36-6-106(a), <u>with</u> Tenn. Code Ann. § 36-6-404(b).

This appeal requires us to focus upon the origin and purposes of the "material change in circumstances" concept, how the articulation of this concept has evolved over time, and how statutes have changed the common law development of this concept.

---

[13](...continued)
<u>Id.</u> § 36-6-404(b)(1)–(16) (2010).

*i. Material Change in Circumstances - Purpose and Historical Development*

At common law, once a term of court ended,[14] trial courts had only limited authority to modify divorce decrees.  See Morrissey v. Morrissey, 377 S.W.2d 944, 945-46 (Tenn. 1964) (discussing the statutes that were enacted to abrogate the common law rule regarding a court's lack of power to modify).  The General Assembly eventually enacted statutes specifically empowering trial courts to retain jurisdiction over and to modify divorce decrees and custody decrees.  Hicks v. Hicks, 176 S.W.2d 371, 375 (Tenn. Ct. App. 1943) (discussing passage of the statutes authorizing modification and the reason for their passage); Crane v. Crane, 170 S.W.2d 663, 665 (Tenn. Ct. App. 1943) (recognizing a statute had been passed stating that a decree regarding custody and child support "'shall remain within the control of the court and be subject to such changes or modification as the exigencies of the case may require'").

The concept of material change in circumstances originated in Hicks, where the Court of Appeals was asked to determine whether the statute empowering courts to modify custody decrees deprived such "decrees of their quality of finality as adjudications" for purposes of the doctrine of res judicata.[15]  Hicks, 176 S.W.2d at 375.  The Court of Appeals answered this question in the negative, explaining:

> They are final for the purpose of execution or appeal; and we think they are final as res adjudicata [sic] upon the facts then existing.  If such a decree should be regarded merely as an interlocutory order, without any force or effect as an adjudication, and if either party, as often as he chose, could relitigate the question of custody or support upon the same evidence and the same facts, great would be the inconvenience to the litigants, the courts, and the public; and any trial of the issues would be but an idle ceremony, since it would settle nothing.

---

[14] In 1984, Tennessee Code Annotated section 16-2-510 abolished terms of court.  The minutes of all courts remain open continuously.  Tenn. Code Ann. § 16-2-510(b) (2009).

[15] The doctrine of res judicata precludes a subsequent lawsuit "between the same parties, or their privies, on the same claim with respect to all issues which were, or could have been, litigated in the former lawsuit."  Jackson v. Smith,  387 S.W.3d 486, 491 (Tenn. 2012).  Res judicata is a "rule of rest," Moulton v. Ford Motor Co., 533 S.W.2d 295, 296 (Tenn. 1976), which promotes finality, "prevents inconsistent or contradictory judgments, conserves judicial resources, and protects litigants from the cost and vexation of multiple lawsuits."  Jackson, 387 S.W.3d at 491.  Although Hicks and Young involved final custody determinations, the res judicata principles enunciated in those decisions apply with equal force to a permanent parenting plan, which designates a primary residential parent and establishes a residential parenting schedule.  See Smallwood v. Mann, 205 S.W.3d 358, 362-63 (Tenn. 2006) (recognizing that visitation rights derive from custody and the constitutional principles which govern custody also govern visitation).

Hicks,176 S.W.2d at 375; see also Young v. Smith, 246 S.W.2d 93, 95 (Tenn. 1952) (stating that a final custody decree will support a plea of res judicata). The Court of Appeals then construed the statutory language authorizing "changes or modification [of a custody decree] as the exigencies of the case" required. Id. (quoting Tenn. Code § 8454 (1932)). Equating "exigencies" with "emergencies," the Hicks court interpreted the statute as follows:

> We think an emergency here must be held to mean *facts and conditions which have emerged since the decree, new facts and changed conditions which were not determined and could not be anticipated by the decree; and that the decree is final and conclusive upon all the facts and conditions which existed and upon which the decree was made.*

Hicks, 176 S.W.2d at 375 (emphasis added). Applying this interpretation, the intermediate appellate court affirmed the trial court's judgment denying the petition to modify, explaining that "[p]ractically all the evidence" offered at the modification proceeding "related to matters which existed when the former decree was entered." Id. at 376.

This Court subsequently adopted the construction Hicks applied to the statutory language. See Smith v. Haase, 521 S.W.2d 49, 50 (Tenn. 1975) (adopting the rule announced in Hicks); Holloway, 230 S.W.2d at 1005 (expressly approving the rule announced in Hicks). Hicks construed the statute in a manner which balanced the interests in finality and stability against the practical reality that changes may occur after the initial custody or visitation decree which necessitate modification. See Ellis v. Carucci, 161 P.3d 239, 243 (Nev. 2007) (recognizing that the concept of material change in circumstances derived from the doctrine of res judicata and was intended to prevent litigants dissatisfied with custody decrees from filing immediate, repetitive, serial motions in the hope of achieving a different result, based on essentially the same facts).

The statutory language at issue in Hicks remained unchanged for many years after this Court approved and adopted the Hicks construction, which suggested the General Assembly approved of the Hicks construction. See Cooper v. Logistics Insight Corp. 395 S.W.3d 632, 639-40 (Tenn. 2013) ("[W]e have long adhered to the rule that when a prior decision has addressed the construction and operation of a statute, the principle of stare decisis will apply unless the General Assembly acts to change the statute.").[16]

---

[16] The Hicks court applied an atypical definition of the term "exigencies." Nonetheless, this definition gained the approval of this Court and the General Assembly. According to the Oxford English dictionary, "exigency" in this context refers to "urgent want" or "pressing necessity," while "emergency" denotes "a juncture that arises or 'turns up'; esp. a state of things unexpectedly arising, and urgently
(continued...)

-17-

Although the statutory language remained the same, the Hicks definition gradually evolved in court decisions from "new facts and changed conditions which were not determined and could not be anticipated by the decree," 176 S.W.2d at 375, to facts and circumstances that were not known and could not have been reasonably anticipated at the time of the initial decree.[17] This subtle reformulation of the definition had the effect of shifting

_____

[16](...continued)
demanding immediate action." Compact Oxford English Dictionary 507, 547 (2d ed. 1991).

[17] See, e.g., Perry v. Perry, No. M2002-01180-COA-R3-CV, 2003 WL 21805298, at *3 (Tenn. Ct. App. Aug. 7, 2003) ("[T]he rule is that a change of custody cannot be based on facts that *were known or reasonably anticipated* at the time of the prior order."); Griffith v. Griffith, No. M2001-02369-COA-R3-CV, 2002 WL 31039332, at *4 (Tenn. Ct. App. Sept. 12, 2002) ("[T]he person seeking a change of custody has the burden of establishing [that] . . . a material change of circumstances has occurred which was not reasonably foreseeable at the time of the original custody determination . . . ."); Jameson v. Redmund, No. M2001-01108-COA-R3-CV, 2002 WL 1974141, at *6-7 (Tenn. Ct. App. Aug. 28, 2002) (stating that a material change in circumstances involves facts or circumstances "that have arisen after the entry of the custody order sought to be changed" and which "were not known or reasonably anticipated when the underlying decree was entered"); Elder v. Elder, No. M1998-00935-COA-R3-CV, 2001 WL 1077961, at *2 (Tenn. Ct. App. Sept. 14, 2001) ("[T]he changed circumstances must not have been reasonably anticipated when the underlying decree was entered."); Warren v. Warren, No. W1999-02108-COA-R3-CV, 2001 WL 277965, at *4 (Tenn. Ct. App. Mar. 12, 2001) (stating that circumstances must have "materially changed in a way that was not reasonably foreseeable at the time of the original custody decision"); Bosi v. Bosi, No. W1999-01533-COA-R3-CV, 2000 WL 705304, at *5 (Tenn. Ct. App. May 24, 2000) (stating that the person seeking modification must prove that "circumstances have materially changed in a way that was not reasonably foreseeable at the time of the original custody decision"); Hoalcraft v. Smithson, 19 S.W.3d 822, 829 (Tenn. Ct. App. 1999) ("In general, the change must occur after the entry of the order sought to be modified and the change cannot be one that was known or reasonably anticipated when the order was entered."); White v. White, No. M1999-00005-COA-R3-CV, 1999 WL 1128840, at *3 (Tenn. Ct. App. Dec. 10, 1999) (stating that a material change in circumstances involves facts or circumstances that "arose after the entry of the custody order sought to be modified" and which "were not known or reasonably anticipated when the underlying decree was entered"); McCain v. Grim, No. 01A01-9711-CH-00634, 1999 WL 820216, at *2 (Tenn. Ct. App. Oct. 15, 1999) ("As a general matter, a material change of circumstances must involve . . . facts or circumstances . . . that were not known or reasonably anticipated when the underlying decree was entered . . . ."); Smithson v. Eatherly, No. 01A01-9806-CV-00314, 1999 WL 548586, at *3 (Tenn. Ct. App. July 29, 1999) (stating the standard as whether "circumstances have materially changed in a way that could not have been reasonably foreseen at the time of the original custody decision"); Geiger v. Boyle, No. 01A01-9809-CH-00467, 1999 WL 499733, at *3 (Tenn. Ct. App. July 16, 1999) (stating that a material change in circumstances requires proof "that the child's circumstances have materially changed in a way that was not reasonably foreseeable at the time of the original custody decision"); Solima v. Solima, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998) (stating that to modify a custody or visitation decree a party must first prove that the circumstances "have changed materially in a way that could not reasonably have been foreseen at the time of the original custody decision"); Adelsperger v. Adelsperger, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997) (describing the standard as whether "circumstances have materially changed in a way that could not have been reasonably foreseen at the time of the original custody decision"); Smith v. Turner, 1993 WL

(continued...)

the focus from whether an alleged material change in circumstances was "determined" or "anticipated" by the original decree to the somewhat different question of whether the alleged material change in circumstances was based upon facts or conditions that were unanticipated by the parties at the time of the original decree.

In addition to reformulating the Hicks construction, the Court of Appeals, in another line of authority, held that a party seeking to establish a material change in circumstances was required to offer proof that failure to modify the prior decree of custody would result in substantial harm to the child. Musselman v. Acuff, 826 S.W.2d 920, 922 (Tenn. Ct. App. 1991) (stating that "only behavior which clearly posits or causes danger to the mental or emotional well-being of a child" warrants changing custody) (citing Ballard v. Ballard, 434 So.2d 1357, 1360 (Miss. 1983)); see also Richardson v. Richardson, No. W2000-02374-COA-R3-CV, 2001 WL 687074, at *3 (Tenn. Ct. App. June 14, 2001); Brown v. Brown, No. 02A01-9709-CV-00228, 1998 WL 760935, at *8 (Tenn. Ct. App. Nov. 2, 1998) (same); Wall v. Wall, 907 S.W.2d 829, 834 (Tenn. Ct. App. 1995) (defining "change of circumstances" as "that which requires a change to prevent substantial harm to the child").

In 2002 and 2003, this Court handed down three decisions aimed at clarifying the concept of material change in circumstances and the analytical framework applicable in modification proceedings. See Blair v. Badenhope, 77 S.W.3d 137 (Tenn. 2002); Kendrick, 90 S.W.3d at 566; Cranston v. Combs, 106 S.W.3d 641 (Tenn. 2003). Each of these decisions expressly approved the subtle reformulation of the Hicks material change in circumstances concept that had developed in the Court of Appeals. See Blair, 77 S.W.3d at 150 ("[T]he change has occurred after the entry of the order sought to be modified and the change is not one that was known or reasonably anticipated when the order was entered."); Kendrick, 90 S.W.3d at 570 (same); Cranston, 106 S.W.3d at 644 (stating that one of the relevant inquiries in determining whether a material change in circumstances has occurred is whether the facts were "not known or reasonably anticipated when the order was entered"). The Court also cautioned in these decisions, however, that no bright-line rules exist for determining whether a material change in circumstances has occurred and that the question of whether an alleged change in circumstances reasonably could have been anticipated at the time of the original

[17](...continued)
398479, at *2 (Tenn. Ct. App. Oct. 1, 1993) ("[A] parent desiring to alter an existing custody arrangement must satisfy the court that the facts or conditions have changed materially in a way that could not have been reasonably anticipated during the earlier proceeding . . . ."); Driver v. Driver, No. 89-385-II, 1990 WL 100422, at *3 (Tenn. Ct. App. July 20, 1990) ("Mr. Driver succeeded in demonstrating that facts and circumstances have occurred since the original custody decision that could not have been reasonably anticipated."); McDaniel v. McDaniel, 743 S.W.2d 167, 169 (Tenn. Ct. App. 1987) ("The trial court's opinion . . . does not reflect any 'new facts and changed conditions which were not determined and could not be anticipated' in our original opinion.").

determination is merely one factor in the analysis. See Blair, 77 S.W.3d at 150; Kendrick, 90 S.W.3d at 570; Cranston, 106 S.W.3d at 644.

The Court's decisions in Blair and Kendrick also implicitly rejected Musselman and its progeny by omitting from the definition of material change in circumstances any mention of the substantial harm requirement. Blair, 77 S.W.3d at 148; Kendrick, 90 S.W.3d at 570. In Cranston, the Court expressly refused to incorporate the substantial harm requirement into the material change in circumstances standard, thereby clearly rejecting Musselman and its progeny. Cranston, 106 S.W.3d at 643-44; see also Kesterson v. Varner, 172 S.W.3d 556, 562-65 (Tenn. Ct. App. 2005) (explaining that Blair, Kendrick, and Cranston rejected the rule announced in Musselman and its progeny).

Meanwhile, in 2002, not long before Kendrick was decided, the General Assembly enacted a statute addressing the material change in circumstances concept.[18] This legislation expressly abrogated Musselman and its progeny and also listed for the first time since Hicks certain facts that may amount to a material change in circumstances. See Kesterson, 172 S.W.3d at 560-62 (discussing Musselman and the legislation enacted to supersede the rule it announced). The 2002 legislation amended Tennessee Code Annotated section 36-6-101 by adding the following language as new subdivision (a)(2)(B):

> If the issue before the court is a modification of the court's prior decree pertaining to custody or a residential parenting arrangement, the petitioner must prove by a preponderance of the evidence a material change in circumstance. *A material change of circumstance does not require a showing of a substantial risk of harm to the child.* A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or circumstances which make the parenting plan no longer in the best interest of the child.
> (i) In each contested case, the court shall make such a finding as to the reason and the facts that constitute the basis for the custody determination.
> (ii) Nothing contained within the provisions of this subdivision shall interfere with the requirement that parties to an action for legal separation, annulment, absolute divorce or separate maintenance incorporate a parenting plan into the final decree or decree modifying an existing custody order.
> (iii) Nothing in this subsection shall imply a mandatory modification to the child support order.

Tenn. Code Ann. § 36-6-101(a)(2)(B) (Supp. 2002) (emphasis added).

_____

[18] Act of June 30, 2002, ch. 859, 2002 Tenn. Pub. Acts 2340.

In 2004, one year after this Court's decision in <u>Cranston</u>, the General Assembly enacted additional legislation addressing the material change in circumstances concept.[19] The 2004 legislation deleted the words "or a residential parenting arrangement" from the first sentence of section 36-6-101(a)(2)(B), enacted in 2002,[20] and added an entirely new subsection pertaining exclusively to modification of a residential parenting schedule.

*ii. Material Change in Circumstances - Current Status*

The 2004 legislation, which is now codified at Tennessee Code Annotated section 36-6-101(a)(2)(C) (2010) and is applicable in this appeal, provides:

> (C) If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(C). Some of the factors listed in section 36-6-101(a)(2)(C) as constituting a material change in circumstances for modification of a residential parenting schedule are not listed in section 36-6-101(a)(2)(B) as a material change in circumstances for purposes of modifying a "prior decree pertaining to custody." Thus, as the Court of Appeals has recognized, the 2004 amendment resulted in Tennessee having a different set of criteria for determining whether a material change in circumstances exists for modification of a "residential parenting schedule" as compared to the standard that applies for modification of "custody"— a statutory term the Court of Appeals has equated to the designation of a "primary residential parent." <u>See, e.g.</u>, <u>Scofield v. Scofield</u>, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007); <u>see also</u> <u>Pippin v. Pippin</u>, 277 S.W.3d 398, 406-07 (Tenn. Ct. App. 2008); <u>Massey-Holt</u>, 255 S.W.3d at 608.

---

[19] Act of May 6, 2004, ch. 759, 2004 Tenn. Pub. Acts 1737.

[20] The 2004 legislation did not otherwise alter Tennessee Code Annotated section 36-6-101(a)(2)(B).

As the Court of Appeals also has recognized, section 36-6-101(a)(2)(C) sets "'a very low threshold for establishing a material change of circumstances'" when a party seeks to modify a residential parenting schedule. Boyer, 238 S.W.3d at 257 (quoting Rose v. Lashlee, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 n.3 (Tenn. Ct. App. Aug. 18, 2006)); see also Marlene Eskind Moses, Modification of Permanent Parenting Plans in Tennessee, 49 Tenn. B.J., May 2013, at 27, 28 ("The aforementioned standard [section 36-6-101(a)(2)(C)] sets what is widely known among domestic [law] practitioners as a very low threshold for establishing a material change of circumstances." (internal quotation marks omitted)). By declaring that changes relating to a child's age or a parent's living or working conditions may constitute a material change in circumstances, the General Assembly has plainly expressed its intent to permit modification of residential parenting schedules based on changes that reasonably could have been anticipated when the original residential parenting schedule was established.[21] Boyer, 238 S.W.3d at 256-57.

We agree with the Court of Appeals that the enactment of section 36-6-101(a)(2)(C) reflects the General Assembly's "policy decision to make it easier to establish that a material change in circumstances has occurred" when a party seeks to modify a residential parenting schedule. Boyer, 238 S.W.3d at 259. "The courts must adhere to this policy." Id. Indeed, our role is to construe statutes in a manner that "effectuate[s] legislative intent and purpose." Britt v. Dyer's Emp't Agency, Inc., 396 S.W.3d 519, 523 (Tenn. 2013). We fulfill this role by focusing on the statutory text and ascribing to the words used their natural and ordinary meaning in the context and in light of the statute's general purpose. Id. When statutory language is unambiguous, courts need look no further to ascertain legislative intent. Id. "Courts may neither alter or amend statutes nor substitute our own policy judgments for those of the General Assembly." Id.

Applying these familiar rules of statutory construction, we conclude that when the issue is modification of a residential parenting schedule, section 36-6-101(a)(2)(C) provides the

---

[21] That the intent of the legislation was to relax the common-law "material change in circumstances" standard for modification of residential parenting schedules is also evidenced by the comments of the sponsors during legislative hearings. The Senate sponsor described the common law standard as "pretty strict" and stated that the legislation would "give the court a few things to consider." Hearing on S.B. 2910 before the Senate Judiciary Committee, 103d Gen. Assemb. (Tenn. Mar. 2, 2004) (statement of Sen. Jeff Miller). He also explained that the legislation "add[s] factors to be considered for a modification as the needs of the child change[] over time" and stated that the courts would be able "to adjust to the changes of life over time and allow modifications to occur more easily when certain changes in life occur." Id. The House sponsor also noted the statute's relaxation of the standard, explaining that "maybe the child is four or five years older than when . . . [the court] first dealt with the issue and that may be a reason to make a modification." Hearing on H.B. 2666 before the House Children and Family Affairs Committee, 103d Gen. Assemb. (Tenn. Apr. 6, 2004) (statement of Rep. Russell Johnson).

governing standard for determining whether a material change in circumstances has occurred. We further conclude that section 36-6-101(a)(2)(C) abrogates any prior Tennessee decision, including Blair, Kendrick, and Cranston, which may be read as requiring a party requesting modification of a residential parenting schedule to prove that the alleged material change in circumstances could not reasonably have been anticipated when the initial residential parenting schedule was established. Consistent with section 36-6-101(a)(2)(C), we hold that facts or changed conditions which reasonably could have been anticipated when the initial residential parenting schedule was adopted may support a finding of a material change in circumstances, so long as the party seeking modification has proven by a preponderance of the evidence "a material change of circumstance affecting the child's best interest." Tenn. Code Ann. § 36-6-101(a)(2)(C) (2010).

Not only is this holding consistent with the policy statutorily established by the General Assembly, it also does not amount to a drastic change in the common law. As explained herein, the "reasonably anticipated" language was not part of the original articulation of the material change in circumstances concept. Moreover, as Blair, Kendrick, and Cranston instructed, when determining whether an alleged material change in circumstances had been established, inquiring whether the facts or circumstances reasonably could have been anticipated at the time of the initial custody decree was articulated as merely one factor in the analysis. Blair, 77 S.W.3d at 150; Kendrick, 90 S.W.3d at 570; Cranston, 106 S.W.3d at 644. This single factor was never intended to be outcome-determinative. Id.; see also Boyer, 238 S.W.3d at 256.

### iii. Application to This Case

In this appeal, the Court of Appeals majority: (1) determined that Father's relocation and remarriage were facts that reasonably could have been anticipated when the original residential parenting schedule was established; (2) erroneously applied this consideration as outcome-determinative; and (3) reversed the trial court's finding of a material change in circumstances. Evaluating the record by the standards provided in section 36-6-101(a)(2)(C) and our holding herein, we reverse the judgment of the Court of Appeals and reinstate the trial court's finding of a material change in circumstances.

The proof is undisputed that, as a result of the sale of his 50% interest in the Greeneville dentistry practice and the purchase of a dentistry practice in Johnson City, Father worked fewer Fridays and had greater flexibility and control of his work schedule, both of which allowed him to spend more time with the children than he could have at the time when the residential parenting plan was established. That Father lived a greater distance from the children after his relocation and spent more of his parenting time with them in transit are also undisputed facts. The children, who were three and not quite one at the time of the divorce, were five and three

years old at the time of the modification proceeding. Finally, the proof established that Father had remarried and that Mrs. Armbrister had developed and maintained a positive relationship with Mother and the children.

Father's proof was aimed at establishing a material change in circumstances based upon "significant changes in the needs of the child[ren] over time, which may include changes relating to age" and "significant changes in the parent's living or working condition that significantly affect parenting[.]" Tenn. Code Ann. § 36-6-101(a)(2)(C). The trial court found that Father had satisfied his burden of proving a material change in circumstances by a preponderance of the evidence. The evidence does not preponderate against the trial court's finding.

Although remarriage is not, in every instance, a material change in circumstances, Tennessee courts have long held that "the possible change in home environment caused by such remarriage is a factor to be considered in determining whether or not there has been a material change in circumstance." Tortorich v. Erickson, 675 S.W.2d 190, 192 (Tenn. Ct. App. 1984). "The character, attitude and general personality of other persons who would be in a position to influence the children are important considerations for the court." Id. (quoting Riddick v. Riddick, 497 S.W.2d 740, 742 (Tenn. Ct. App. 1973)). We agree with Judge Susano that the proof in this case established that Father's remarriage significantly affected his parenting in a positive way. In the original divorce decree, the trial court found that Mother had served as the "the primary caregiver for the children and had taken the greater responsibility for performing parental responsibilities" during the marriage and "particularly following the parties' separation," while Father had "spent considerable portions of his recreational time traveling and playing golf" during the marriage and had "spent limited co-parenting time" with his daughter because the parties had separated shortly after her birth. The proof introduced at the modification hearing established that Father's move and adjustment of his work schedule now allow him to participate enthusiastically in his son's extracurricular activities and that he is looking forward to participating in his daughter's activities as well. Mother expressed surprise at how well the residential parenting schedule had functioned, given Father's limited interaction with the children during the marriage. Mother acknowledged that Mrs. Armbrister had established a good relationship with the children. Given the lower threshold applicable in modification proceedings, the proof in the record simply does not preponderate against the trial court's finding that Father established a material change in circumstances.

### C. Best Interests of the Children

Our conclusion that the proof supports the trial court's finding of a material change in circumstances answers only the threshold question in this modification proceeding. It does not

predetermine the outcome of the case. Boyer, 238 S.W.3d at 260. The second step of the court's analysis entails a determination of the child's best interests, utilizing the factors in section 36-6-106(a). See Tenn. Code Ann. § 36-6-101(a)(2)(C); id. § 36-6-401(a) ("In any proceeding between parents under this chapter, the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities."). The trial court in this case considered the appropriate statutory factors, as well as the General Assembly's recognition of "the fundamental importance of the parent-child relationship to the welfare of the child" and its declaration that "the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests." Id. § 36-6-401(a) (2010). The trial court also referenced the statute, which became effective June 6, 2011, directing the court to "order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)–(10), the location of the residences of the parents, the child's need for stability and all other relevant factors." Id. § 36-6-106(a) (Supp. 2013).[22] Upon evaluating all the relevant factors, the trial court concluded that modifying the residential parenting schedule was in the children's best interests. The evidence does not preponderate against this finding.

Once a material change in circumstances affecting the children's best interests has been established, a court finally must utilize the process prescribed by Tennessee Code Annotated section 36-6-404(b) to determine how the residential parenting schedule should be modified. See Tenn. Code Ann. § 36-6-405 (2010) ("The process established by § 36-6-404(b) shall be used to establish an amended permanent parenting plan . . . ."). We have already reviewed the process that section 36-6-404(b) requires and will only briefly reiterate it here. First, a court must determine whether either parent has engaged in any of the conduct described in section 36-6-406, which would necessitate limiting that parent's residential time with the child. See Tenn. Code Ann. § 36-6-404(b), -406 (2010). If section 36-6-406 does not apply, a court must then consider the fifteen specific factors enumerated in the statute, id. § 36-6-404(b)(1)-(15), and may also consider "[a]ny other factors deemed relevant by the court," id. 36-6-404(b)(16). In this case, the trial court did not reference the 36-6-404(b) factors specifically. However, since these factors are substantially similar to those of 36-6-106(a), the omission of this analysis does not change the result nor is it likely to do so in most instances.[23]

---

[22] Although this statutory amendment became effective after Father filed his motion to modify, the trial court did not err by referencing it. This legislation reflected the General Assembly's most recent policy statement on the question before the trial court and was not a change in policy but a more specific statement of the policy already expressed in other statutes. See Tenn. Code Ann. § 36-6-401(a).

[23] The major differences between sections 36-6-106(a) and 36-6-404(b) are that section 36-6-106(a)(3) and (8) contain explicit provisions designed to protect families and children who are the victims of physical and sexual abuse, while 36-6-106(a)(5) articulates the proper procedure for obtaining court-
(continued...)

The trial court did not err by increasing Father's residential parenting days from 85 to 143. As noted earlier in this opinion, the specific modifications a trial court adopts to address a material change in circumstances and to serve the best interests of children are the kinds of details an appellate court should not "tweak" absent an abuse of discretion. Eldridge, 42 S.W.3d at 88. An abuse of discretion occurs "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." Id. The trial court recognized the importance of stability and consistency, and as a result, preserved, to the extent possible, the original residential parenting schedule. The trial court also structured the modified residential parenting schedule so that it reflected the way Father and Mother had already been cooperating with each other to afford Father additional time. For example, the trial court added overnight parenting time to the alternating weekend and Wednesday parenting time Father had received under the original schedule, and added two additional, non-consecutive weeks of parenting time in the summer, giving Father a total of four non-consecutive weeks in the summer. The trial court's ruling falls squarely within the spectrum of reasonableness Eldridge envisioned and in no way amounts to an abuse of discretion.

We would be remiss if we did not note that the facts in this appeal are most unusual for a post-divorce proceeding because Mother and Father have established a positive and cooperative relationship with each other since the divorce. Unfortunately, courts are called upon all too often to resolve disputes between parents who refuse to communicate and cooperate with each other concerning their children because of the lingering "bitterness" of the divorce. Parker v. Parker, No. M2001-01453-COA-R3-CV, 2003 WL 21463004, at *2 (Tenn. Ct. App. June 25, 2003). Such bitterness tends to deepen the pain of divorce for children and subject them to unnecessary conflict. See Vanderpool v. Boone et al., No. 01-A-01-9508-CH00358,1996 WL 135109, at *4 (Tenn. Ct. App. Mar. 27, 1996). Despite their adversarial positions in this proceeding, Mother and Father are to be commended for not allowing such residual antipathy to interfere with their parenting responsibilities. Our conclusion that the proof supports the trial court's findings that Father established a material change in circumstances and that modifying the residential parenting schedule is in the children's best interests certainly should not be viewed as calling Mother's parenting skills into question. To the contrary, the proof overwhelmingly establishes, as Father put it, that Mother is "a great Mom." The modification does, however, allow Father to move closer to the

---

[23](...continued)
ordered mental or physical exams of parents or caregivers as well as the mechanisms for ensuring the confidentiality of the resulting records. Substantially the same result will occur when the court applies 36-6-406 prior to applying the 36-6-404(b) factors. Section 36-6-404(b) also includes a factor that explicitly takes account of "each parent's employment schedule" as well as a factor encouraging parents to attend court-ordered parent education seminars.

statutory goal, which is to allow both parents to enjoy the "maximum participation possible" in the lives of their children. Tenn. Code Ann. § 36-6-106(a) (Supp. 2013). Recognizing their combined efforts to date, we encourage these parents to continue focusing upon, and working together to foster, the best interests of their children.

## IV. Conclusion

We conclude that the Court of Appeals erred by reversing the trial court's judgment modifying the residential parenting schedule. Accordingly, the judgment of the Court of Appeals is reversed, and the judgment of the trial court is reinstated. Costs of this appeal are taxed to Melissa H. Armbrister and her surety, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE