

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 18, 2017 Session

## MARK ANTONIO ALLEN v. CANDY RACHELLE MUNN ALLEN

Direct Appeal from the Circuit Court for Shelby County
No. CT-005271-09     Donna M. Fields, Judge

No. W2016-01078-COA-R3-CV

This appeal arises from the post-divorce restriction of an alternate residential parent's parenting time. The parties divorced in 2010. By agreement, the father was designated primary residential parent of the parties' two minor children. The original parenting plan gave the mother 160 days of unsupervised visitation per year, including time in the summers and on holidays. In 2014, the father filed a petition requesting that the trial court restrict mother's parenting time to supervised visitation only. Father's lawyer then approached the trial court *ex parte* with an affidavit of the daughter's psychologist and requested emergency relief restricting the mother's visitation. The trial judge signed a temporary injunction requiring the mother's parenting time to be supervised. When the mother attempted to set aside this injunction, the trial court ordered the mother to undergo a Rule 35 evaluation. After performing his examination of the mother, the independent Rule 35 evaluator testified that the mother was capable of caring for her children without supervision. Nevertheless, the trial court entered a final order and permanent parenting plan that substantially decreased the mother's parenting time and required it to be supervised indefinitely. The trial court also awarded the father $15,000.00 in attorney's fees. Following a thorough review of the record, we vacate the order of the trial court restricting the mother's parenting time, reverse the trial court's order awarding the father attorney's fees, remand the case to the trial court, and necessarily reinstate the parties' original parenting plan.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated in part, Reversed in part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY ARMSTRONG, JJ., joined.

Lara E. Butler and Elizabeth W. Fyke, Memphis, Tennessee, for the appellant, Candy Rachelle Munn Allen.

Kay Farese Turner, Memphis, Tennessee, for the appellee, Mark Antonio Allen.

## OPINION

## I. FACTS & PROCEDURAL HISTORY

Mark Antonio Allen ("Father") and Candy Rachelle Munn Allen ("Mother") were married on February 26, 2004. Two minor children were born of the marriage – a son, Jaison, now age 13, and a daughter, Tessa, now age 12 (collectively the "Children"). Father filed a complaint for divorce against Mother on November 10, 2009. Father and Mother were able to mediate a resolution to the issues in the divorce case, and the trial court entered a final decree of absolute divorce and an agreed permanent parenting plan on October 18, 2010 (the "Original Plan"). By agreement of the parties, the Original Plan designated Father as the primary residential parent, receiving 205 days of parenting time, and Mother as the alternate residential parent, receiving 160 days of parenting time. In addition to her weekly visitation schedule, Mother was also granted two weeks with the Children in the summers, alternating holidays, and joint decision-making with Father on all major decisions regarding the Children. Neither party's parenting time was to be supervised pursuant to the Original Plan.

In the summer of 2012, the parties informally agreed for the Children to move temporarily to Oregon with Mother while Father was recovering from back surgery. About a year and a half later, in December 2013, Mother petitioned the trial court (then Judge John McCarroll) to modify custody and the Original Plan, citing the fact that Father had allowed the Children to live with her in Oregon for an extended period of time and attend school there. On August 19, 2014, Judge McCarroll denied Mother's request finding that the Children's move was intended to be temporary. Judge McCarroll further found that, although Mother and Father were equal in a majority of the factors to be considered when determining whether to change a parent's status from alternate residential parent to primary residential parent, Mother's living situation was not stable at that time. Judge McCarroll therefore left the Original Plan in full force and effect.[1] Shortly thereafter, Judge McCarroll retired, and Judge Donna Fields became the new trial judge in this case.[2]

---

[1] Mother subsequently filed a motion for a new trial or to alter or amend the order denying her petition to modify custody. Judge McCarroll denied this motion citing the lack of any new evidence or law to be considered.

[2] This matter was originally heard by Judge McCarroll in Shelby County Circuit Court, Division I. When Judge McCarroll retired, Judge Felicia Corbin Johnson replaced him as Circuit Court judge for Division I. Father then filed a motion for Judge Johnson to recuse herself from the case, which she granted, and on September 16, 2014, the case was transferred to Judge Donna Fields in Division VII.

On December 19, 2014, Father filed a pleading styled "Petition for Modification of Permanent Parenting Plan, Emergency Petition for Temporary Injunction and Restraining Order and Petition for Civil Contempt" against Mother. In this petition, Father alleged that Mother's parenting time should be restricted to only supervised visitation in order to protect the Children from the emotional upset and psychological abuse that they were experiencing at the hands of Mother.

With no hearing having taken place on Father's petition for modification, on January 20, 2015, counsel for Father approached the trial court *ex parte* for emergency relief with an affidavit of Dr. Elizabeth Harris as support. In her affidavit, Dr. Harris, a practicing clinical psychologist, stated that she had counseled Tessa in about seven sessions over the past two months. Father had informed Dr. Harris of the ongoing litigation with Mother regarding custody of the Children. According to her affidavit, it appeared to Dr. Harris that Mother had been attempting to undermine Tessa's relationship with her Father. Although Dr. Harris never spoke with Mother regarding these issues with Tessa, her affidavit deemed Mother to be "psychologically unhealthy," a characterization Dr. Harris would later withdraw. Dr. Harris's affidavit further alleged Tessa had reported that her Mother was assuring Tessa she would be moving with her to Atlanta. Dr. Harris would also later recant that statement. Additionally, Dr. Harris stated that Mother was allowing Tessa to engage in unsupervised access to the internet and that Tessa was posting age-inappropriate materials online. In sum, Dr. Harris's affidavit stated that it was her opinion, "based upon a reasonable degree of psychological certainty, that [Tessa] is at risk of being permanently damaged by being allowed to continue unsupervised parenting time with her mother," and that "mother should be required to immediately undergo a psychological and psychiatric evaluation." Based on these allegations and without hearing any proof from Mother, Judge Fields granted Father's request for emergency relief and signed a Fiat that stated, in pertinent part, as follows:

> All parenting time to be exercised by Mother shall be supervised until a full hearing on the Petition for Modification of Permanent Parenting Plan and Petition for Contempt filed herein, or further orders of this court at The Exchange Club for 2 hours each visit in Memphis.

On February 6, 2015, the trial court held a hearing regarding the aforementioned injunction and Mother's subsequent motion to set it aside. At that hearing, as well as throughout the duration of the litigation, there was a considerable degree of confusion amongst the attorneys for both parties and the trial judge as to why exactly they were there, procedurally speaking. However, all involved appeared to eventually agree that the court should determine whether Father was entitled to the continuation of the injunctive relief he requested in his petition that would keep mother from seeing the children on an

unsupervised basis, as well as resolve a request by Father that Mother be required to undergo a psychiatric evaluation pursuant to Rule 35 of the Tennessee Rules of Civil Procedure. At this hearing, Mother's position was that Dr. Harris's affidavit was erroneous in several material respects but that, even assuming everything that was alleged was true, Father's allegations and Dr. Harris's affidavit were insufficient on their face to support imposing supervised visitation on Mother.

The proof presented at the February 6, 2015 hearing consisted of the testimony of Dr. Harris, Avis Allen (Father's wife), and Mother. Father did not testify at this hearing. Dr. Harris offered her expert testimony related to the circumstances outlined in her affidavit. Initially, Father enlisted Dr. Harris's help in November 2014 because Tessa had written an apparent "suicide note." However, after meeting with Tessa, Dr. Harris determined that Tessa was sad and unhappy, most likely from missing her Mother but that she was "not a threat to herself." Nonetheless, Dr. Harris was troubled when she was told that Mother had contacted the Department of Children's Services to report alleged abuse of Tessa by Father. Dr. Harris did not feel that Mother's report was warranted, and she thereafter contacted Father's attorney to express her concern.[3] After communicating with Father's attorney and/or her staff, Father's attorney's office typed Dr. Harris's affidavit for Dr. Harris to review and sign. During her testimony on February 6, 2015, Dr. Harris went through the assertions in her affidavit, elaborating on some and disavowing others. Dr. Harris stood by her conclusion that she did not believe Tessa's access to the internet/social media was advisable or age appropriate. While admitting that most of her information had come from Father, Dr. Harris still recommended that Mother be required to undergo a Rule 35 evaluation. On the other hand, Dr. Harris did clarify some key aspects of her affidavit. Although the affidavit asserted that Mother was taking Tessa to different schools in Atlanta and assuring her she would be living there, Dr. Harris said at the hearing that was a misstatement, and that "Tessa just told me about the schools . . . I don't know that . . . she has actually, physically, been to any schools." Likewise, Dr. Harris acknowledged that the affidavit was in error in stating that Mother was assuring Tessa she would be living in Atlanta and rather Tessa had only told Dr. Harris that she was hopeful she would be able to live with her Mother in Atlanta. Regarding Dr. Harris's allegation in her affidavit that Mother was psychologically unhealthy, Dr. Harris conceded on cross-examination that it was "probably not" appropriate for her to have made that statement without even meeting with Mother and that she likely "erred on the side of not reaching out to speak with [Mother]" before she signed her affidavit. Additionally, Dr. Harris had apparently supervised at least one session of Mother's parenting time with the Children. Recalling the session, Dr. Harris stated that the Children were both very happy to see Mother and that "[i]t was lovely. They played a game together and they did make a sandbox scene together. It was a very

---

[3]The Department of Children's Services closed the case as unsubstantiated.

appropriate interaction. . . . I'm very concerned [about] Tessa, especially, but Ja[i]son [] also, being able to have time with their mother. They're very connected to her. They love her very much. There's a strong bond there."

Avis Allen, Father's most recent wife, also testified on February 6, 2015. Mrs. Allen was living with Father when the Children returned to Father's home in the summer of 2014, although Father was then still married to the Children's first step-mother at that time. According to Mrs. Allen, Tessa became hostile toward Father after the court initially denied Mother's petition to gain custody of the Children, and Tessa began insisting she wanted to live with her Mother, particularly when she returned from visitation with Mother. Mrs. Allen also disagreed with Tessa's internet usage, although some of it was shown to have occurred at Father's house, and she was concerned about Tessa's "suicide notes," including one that Mrs. Allen and Father had seen but had not been shown to Mother until the day of the hearing.

The court then heard testimony from Mother, who was questioned extensively regarding Tessa's social media usage. It is abundantly clear from the record that the trial court was not at all comfortable with Tessa's or Mother's activities on the internet. The trial court appeared concerned that Mother posting fully-clothed pictures of her Children on sites such as Facebook and Instagram would be tempting to child predators. Tessa also posted pictures and a video of herself giving a makeup tutorial, which was of apparent grave concern to the court. Mother confirmed that she had made a report to the Department of Children's Services but said she did so because Tessa told her that Father used physical force with her. Mother further testified to the hardship that the restricted visitation was imposing on her, not only because she missed her Children, but she was now working from 8:00 a.m. until 5:00 p.m., which impaired her ability to use the Exchange Club for supervised visitation. Mother further explained that she sent text messages to Father several times asking him to have the Children call her but that he never responded.

After hearing the testimony of Dr. Harris, Avis Allen, and Mother, the trial court decided to continue requiring Mother's visitation to be restricted and supervised and denied Mother's request to set aside the injunctive relief. Although the court made no formal findings of fact or conclusions of law at that time to support her decision, she did mention that in her opinion Tessa was "on the wrong path." Additionally, the court ordered that Mother undergo a psychological evaluation pursuant to Rule 35 of the Tennessee Rules of Civil Procedure, which would be paid for by Mother, and that the supervised visitation would continue until the evaluation was complete.[4]

---

[4]The trial court's oral ruling from February 6, 2015 was subsequently memorialized in a written order that clarified, among other things, that Mother was allowed supervised visitation of up to six hours per week of parenting time in her residence to be supervised by Shari M. Myers or any employee of Ms. Myers,

Mother's Rule 35 evaluation was completed by Dr. John Ciocca in July of 2015. Generally speaking, Dr. Ciocca concluded that, although Mother was not a perfect person or a perfect parent, she did possess the judgment to care for her children on an unsupervised basis. The "Summary and Recommendations" section of Dr. Ciocca's report provided:

> Ms. Munn is a 44 year old African-American female, who does not present with any major symptoms of mental illness or psychological distress. She does present with anxiety, worry and sadness about her current limited access to her children. Further, she demonstrates a somewhat obsessive and narcissistic style that inhibits her self[-]awareness and insight.
>
> She is willing to admit to mistakes in judgment and her failure to inform Mr. Allen directly about their daughter's increasing psychological discomfort . . . . [S]he denies any intentional efforts to promote her daughter's distress[.]
>
> . . . . Ms. Munn expressed concern that her [ex-] husband wished to exaggerate her shortcomings and limit her access to the children, despite her positive relationship with them as primary parent during their two year stay in Oregon.
>
> **Overall, however, she demonstrates the capacity to care for her children in a loving, careful and thoughtful manner, and does not represent danger of harm to herself or others.** The use of a family therapist will be useful in her management of the children's adjustment to their current circumstances and to offer advice regarding her tendency to indulge her children as a means of dealing with their mutual sadness and disappointment. Further[,] the use of a family counselor, such as Dr. Harris, will serve to improve the cooperation between her and the children's father regarding the guidelines and restrictions for the children. Ms. Munn should also pursue individual psychotherapy to improve her insight and help manage her sadness and anger regarding the current circumstances. **Ms. Munn does not demonstrate any limitations that would prevent her from functioning as well as an average parent under the current circumstances.**

---

who worked for a group that would supervise parental visitation for a fee. This was, however, all contingent on Mother being able to pay the substantial fees required to have Ms. Myers supervise her visitation.

(Emphasis added.)

Based on this report, Mother filed a petition to set aside the injunctive relief requiring supervised visitation and to modify the previous orders of the court related to Mother's restricted parenting time. On October 9 and October 12, 2015, the trial court once again heard testimony on these issues. In addition to presenting the aforementioned written report of his conclusions about Mother's capacity to parent her Children, Dr. Ciocca testified before the trial court as follows:

Q. . . . [T]ell the Court what your conclusion was regarding Ms. Munn's ability to parent her children without supervision.

A. My opinion . . . to a reasonable degree of psychological and professional certainty . . . . indicated that I felt like her psychological functioning was sufficiently stable to allow her to exercise reasonable judgment in caring for her children.

Q. **Do you think that she has the judgment to care for her children on an unsupervised basis?**

A. **Yes, that was my conclusion**.

(Emphasis added.) Regarding the allegation in Dr. Harris's affidavit that Mother was causing harm to Tessa by getting her hopes up that she might move to Atlanta, Dr. Ciocca stated the following:

A. She [Dr. Harris] opined in [her] affidavit that Mother was negatively impacting the child by inappropriately getting her hopes up and creating in the child a sense of anticipation that ultimately led to disappointment and depression in the child[.]

Q. Okay. When you evaluated Ms. Munn, what did you discover; what did you delve into with her about that behavior?

A. I talked with her about that very issue. She elaborated with me that her daughter had expressed to her a desire to move with her and that she had to deal with that issue on a regular basis and had to learn to deflect and reduce the child's expectations.
That was certainly an issue between her and her daughter. It was a dynamic part of the discussion that she had to deal with, but quite to the contrary, **rather than increasing her expectations, she was trying to**

7

**dampen them and had been doing so ever since . . . the summer of 2014**.

(Emphasis added.)

Dr. Ciocca also explained to the court how extensively he prepared himself before reaching these conclusions. In addition to his individual interviews with Mother, Dr. Ciocca reviewed the Original Plan that was agreed to and signed on October 18, 2010; Mother's Petition to Modify Custody filed in December of 2013 and the Order denying that Petition and Mother's request for a new trial; Father's Petition for Modification of Permanent Parenting Plan filed on December 19, 2014; the affidavit of Dr. Harris filed January 20, 2015; the transcript of trial testimony and court ruling of February 6, 2015; the order on Father's Emergency Petition for Temporary Injunction, signed by the trial court on February 11, 2015; the order on Motion for Rule 35 Evaluation of Mother, which was entered on February 11, 2015; blog postings provided by Father's attorney; Ms. Munn's medical records; copies of Mother's diary entries; and notes from some supervised visits Mother had with the Children at the Exchange Club. Furthermore, Dr. Ciocca conducted testing of Mother using the Minnesota Multiphasic Personality Inventory 2 and the Milan Clinical Multiaxial Inventory 3. Dr. Ciocca testified to the following regarding the results of those tests:

> Q. Are there any things in your testing, your findings, that would prevent [Mother] from . . . parenting her children on an unsupervised basis?
> A. There was nothing in my overall evaluation, testing, interviews, any element of my evaluation that would suggest that she's not capable of taking care of her children and making reasonable judgments about [her] children.
> That doesn't mean she's perfect, but the imperfections and issues that emerged as a result of my evaluation suggested that she was just as capable now of caring for her children as she was during the two-year period that she had custody of her children due to Dad's permission to have them in Oregon.
> So I didn't see any difference, over time, in her capacity in caring for her children based on her previous functioning.
> . . . .
> A. With regard to her ability to function as a parent on an unsupervised basis . . . I don't see any of her shortcomings as limiting her ability to function as an average parent taking care of children in our society today.

Dr. Ciocca then addressed Father's and the court's concerns regarding Mother and

Tessa's social media usage. According to Dr. Ciocca, Mother "responded well" in his conversations with her about what Judge Fields felt was acceptable behavior on social media. Although Mother admitted she had posted a picture online in violation of the trial court's order to refrain from putting her Children's photographs on the internet, Dr. Ciocca testified that Mother now understood the court's and Father's rules on social media. Additionally, despite incessant attempts by Father, through his counsel, to prove that Mother had not complied with the rules of the Exchange Club during her supervised visits with the Children at their facility, Dr. Ciocca testified that, in reviewing the Exchange Club's notes, he found Mother "was very compliant with the rules and that there were no major infractions." In response to Father's attorney's repeated questioning about Mother allegedly breaking a rule at the Exchange Club by bringing gifts to her Children on "no gift" days, Dr. Ciocca stated: "I don't consider it egregious. Even as I sit here having been cross-examined by you about those records for 30 to 45 minutes, even I'm still confused about exactly what their rules are about gifts." In sum, Dr. Ciocca testified:

> There is nothing that I reviewed today or heard today that would change my recommendations . . . which indicated that I believe within a reasonable degree of psychological and professional certainty that [Mother] demonstrates the capacity to care for her children in a loving, careful, and thoughtful manner, and that means within the confines of the existing parenting plan in 2010.

The court also heard more testimony from Mother, Avis Allen, and also Father. According to Mother, she met with Dr. Harris the week before and also made an appointment for individual therapy for herself. She testified that she was currently working as a receptionist at a law firm making $13 per hour and that she was as active as she could be in her Children's lives and school activities given the circumstances. Avis Allen again testified that she felt Tessa's negativity towards Father was stemming from Mother's feelings towards him, and she therefore felt supervised visitation and supervised phone calls were still necessary. Father essentially echoed this sentiment, stating that he "worr[ies] about Tessa going back to the way it was, to the way she wouldn't talk to me."

At the conclusion of the proof, counsel for both parties and the judge discussed whether it was appropriate to continue supervised visitation. According to counsel for Mother, the facts presented did not give rise to the imposition of supervised visitation. Further, Mother's counsel suggested that, rather than restricting Mother's parenting time, the court could order Mother to participate in counseling if she found that to be necessary. The court was not persuaded. With regard to Dr. Ciocca's testimony, who was the court's independent evaluator, the judge said that she had "listened to Dr. Ciocca and [] heard as much of what he didn't say as to what he did say." The court then

ordered Mother's restricted and supervised visitation to continue, giving her six hours on Saturday and six hours on Sunday every other weekend if Mother could pay the supervisors to be there.[5] And, as a parting warning to Mother, the court stated that "this is not part of the order, but I will say this, if I see one more [internet] post with that child's face on it, that may be cutting off all visitation together totally."

With Mother's supervised visitation still in place and several issues outstanding from Father's original petition for a change in the parenting plan, on December 23, 2015, Mother moved the court to dispose of all issues so that she could appeal the court's ruling. The trial court denied Mother's motion but agreed to set the matter for yet another evidentiary hearing. The court heard additional testimony and argument of counsel for both parties on February 24, 2016. As a result of that hearing, on May 20, 2016, the trial court entered the following three orders that concluded the matter and constitute final orders: (1) an order granting Father's motion to modify the Original Plan to restrict visitation and require it to be supervised; (2) an order awarding Father attorney's fees (that were later set in the amount of $15,000); and (3) a new permanent parenting plan. The new parenting plan gives Mother zero days of parenting time for purposes of child support, allows Mother supervised visitation for six hours on Saturday and six hours on Sunday every other week, does not allow for Mother to have any extra holiday time with the Children, gives Father sole decision making authority, and requires Mother to pay Father $446 per month in child support.

## II. ISSUES PRESENTED

Mother presents the following issues for our review on appeal:

1. Whether the trial court erred by ordering supervised visitation to Mother?

2. Whether the trial court erred in awarding Father attorney's fees?

## III. DISCUSSION

A. Standard of Review

This case was tried by the trial court without a jury. We therefore review the trial

_____

[5]In order to maximize her visitation supervised by Shari Myer's group, A Family Connection, Mother would have to pay $1,800 per month, when her income for purposes of setting child support was only $2,441.66.

court's findings of fact *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). "A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Armbrister*, 414 S.W.3d at 692. We review the trial court's conclusions of law *de novo* with no presumption of correctness. *Hyneman v. Hyneman*, 152 S.W. 3d 549, 553 (Tenn. Ct. App. 2003).

Matters of custody and visitation are generally within the broad discretion of the trial court. *Melvin v. Melvin*, 415 S.W.3d 847, 850-51 (Tenn. Ct. App. 2011) (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *Smallwood v. Mann*, 205 S.W.3d 358, 361 (Tenn. 2006)). However, a trial judge's discretion when determining the details of custody and visitation must be based on evidence and applicable rules of law. *Hogue v. Hogue*, 147 S.W.3d 245, 251 (Tenn. Ct. App. 2004). "[A]n appellate court will not find that a trial court has abused its discretion unless the trial court's parenting arrangements 'fall[ ] outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" Cook *v. Cook*, No. M2015-00253-COA-R3-CV, 2015 WL 8482403, at *3 (Tenn. Ct. App. 2015) (quoting *Armbrister*, 414 S.W.3d at 693. A trial court abuses the discretion afforded to it when it applies an incorrect legal standard or makes a decision that is against logic or reasoning causing an injustice to the complaining party. *Eldridge*, 42 S.W. 3d at 85.

Mother appeals the trial court's imposition of supervised visitation, as well as the trial court's award of attorney's fees to Father. Mother asserts that the trial court applied the incorrect legal standard in this matter and reached an illogical conclusion. Furthermore, Mother avers that even if the trial court had applied the correct legal standard to the proof in this case, the evidence does not support the severe restriction imposed upon Mother's right to visit her Children.

B.    Modification of the Parenting Plan

   1. Material Change in Circumstances

Except in certain extreme circumstances, the public policy of the State of Tennessee requires courts to fashion custodial arrangements with the least restrictive visitation limits possible on an alternate residential parent in order to encourage the parent-child relationship. *See* Tenn. Code Ann. §§ 36-6-301, 36-6-406(d)(1-8); *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988). The Tennessee General Assembly even amended the statute pertaining to child custody in 2011 to explicitly state the following:

In taking into account the child's best interest, the court shall order a

11

custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out [in subdivisions (a)(1)-(10)], the location of the residences of the parents, the child's need for stability and all other relevant factors.

Tenn. Code Ann. § 36-6-106(a). *See* 2011 Pub. Acts, ch. 433 § 1 (effective June 6, 2011).

After a court has approved a permanent parenting plan and incorporated it into a final divorce decree, both parents must comply with the plan unless and until it is modified by a court as permitted by law. *See* Tenn. Code Ann. § 36-6-405 (2010); *Armbrister*, 414 S.W. 3d at 697-98. Following the *Armbrister* decision, the General Assembly amended Tennessee Code Annotated sections 36-6-404(b) and 36-6-106(a). Pursuant to these amendments, when a court considers a petition to modify a residential parenting schedule, the court must first determine whether a material change of circumstances has occurred. Tenn. Code Ann. § 36-6-101(a)(1)(C). If that change is established, the trial court then "proceeds to determine whether modification of the schedule is in the best interest of the child, utilizing the factors at § 36-6-106(a) and, where applicable, § 36-6-406." *Wheeler v. Wheeler*, M2015-00377-COA-R3-CV, 2016 WL 3095695, at *3 (Tenn. Ct. App. May 24, 2016) (*no perm. app. filed*).

Turning to the case at hand, through all of the extensive and muddy procedural history of the case, ultimately the trial court ordered the modification of a pre-existing parenting plan that included a severe restriction on the alternate residential parent's parenting time. However, we cannot determine that the trial court ever definitively addressed whether a material change in circumstances occurred. A material change in circumstances was alleged and testified to by Father, and it appears that both the parties and the trial court presumed Father met this burden. Additionally, Mother did not raise the absence of a "material change in circumstances" as an issue on appeal in accordance with Rule 27(a)(4) of the Tennessee Rules of Appellate Procedure. This Court has repeatedly determined that issues not raised on appeal are waived. *See Black v. Blount,* 938 S.W.2d 394, 403 (Tenn. 1996). Thus, we must assume Father met his burden of proving a material change in circumstances.

2. Best Interests

Assuming Father met his burden of proving a material change in circumstances as the first hurdle in modifying a permanent parenting plan, as we must, our analysis does not end. The second step of the analysis requires an examination of whether modification is in the best interests of the children, using the factors at Tennessee Code Annotated section 36-6-106(a) and, where applicable § 36-6-406. *See Wheeler*, 2016 WL 3095695,

at *4. Tennessee Code Annotated section 36-6-404(b) states, in part, "[i]f the limitations of § 36-6-406 are not dispositive of the child's residential schedule, the court shall consider the factors found in § 36-6-106(a)(1)-(15)." Tenn. Code Ann. § 36-6-404(b) (2014).[6]

---

[6]Tennessee Code Annotated section 36-6-406(a)-(d) provides:

(a) The permanent parenting plan and the mechanism for approval of the permanent parenting plan shall not utilize dispute resolution, and a parent's residential time as provided in the permanent parenting plan or temporary parenting plan shall be limited if it is determined by the court, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct:
(1) Willful abandonment that continues for an extended period of time or substantial refusal to perform parenting responsibilities; or
(2) Physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.
(b) The parent's residential time with the child shall be limited if it is determined by the court, based upon a prior order or other reliable evidence, that the parent resides with a person who has engaged in physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.
(c) If a parent has been convicted as an adult of a sexual offense under § 39-15-302, title 39, chapter 17, part 10, or §§ 39-13-501 -- 39-13-511, or has been found to be a sexual offender under title 39, chapter 13, part 7, the court shall restrain the parent from contact with a child that would otherwise be allowed under this part. If a parent resides with an adult who has been convicted, or with a juvenile who has been adjudicated guilty of a sexual offense under § 39-15-302, title 39, chapter 17, part 10, or §§ 39-13-501 -- 39-13-511, or who has been found to be a sexual offender under title 39, chapter 13, part 7, the court shall restrain that parent from contact with the child unless the contact occurs outside the adult's or juvenile's presence and sufficient provisions are established to protect the child.
(d) A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:
(1) A parent's neglect or substantial nonperformance of parenting responsibilities;
(2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;
(3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;
(4) The absence or substantial impairment of emotional ties between the parent and the child;
(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;
(6) A parent has withheld from the other parent access to the child for a protracted period without good cause;
(7) A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or
(8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

The following factors are set forth in section 36-6-106(a) for the trial court's consideration:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil

Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106.

At the conclusion of the hearing on October 12, 2015, the trial court judge began to give her rationale for continuing supervised visitation by saying that she was "extremely troubled with the situation in which [she] finds these children . . . . concerning the dangers of the Internet, concerning being exposed to people that, Tessa, particularly,

15

shouldn't be exposed to, having psychological issues because of her parents. . . . from the divorce."  The court also appeared to be unimpressed with Mother's attendance for visitation with the Children at the Exchange Club, including that Mother cancelled visitation with the Children because of a family reunion and travelling to and from Atlanta.  The court further noted that Mother has had a "very unstable job situation" but that Mother had succeeded in securing a house in Memphis in which the Children could come visit her.

The trial court then began to discuss the testimony of Dr. Ciocca, the court's Rule 35 evaluator, stating that "in this Court's estimation [Dr. Ciocca] testified as favorably toward [Mother] as he could,"  but that the court had made note of some of "Dr. Ciocca's admission[s] that there are problems."  These "problems" referenced by the trial court included Mother showing Tessa a picture of a school she might attend in Atlanta, Mother discussing her new home in Atlanta with Tessa, Mother's violations of the Exchange Club's rules, and Mother posting a picture of Tessa on the internet when the court had told her not to.  According to the trial court, Mother's internet post "showed poor judgment and poor impulse control," and Mother did not understand the significance of violating the rules of the court and the Exchange Club.  However, the court did not hold Mother in contempt for this violation.  The court went on to point out some specific instances of Mother breaking the rules of the Exchange Club, including bringing the Children gifts on the wrong days, saying the words "oh, Jesus" when she was reprimanded by the Exchange Club staff, and asking how one of the Children had gotten a red mark on his eye.

The court continued, stating that Dr. Ciocca said that Mother "considers herself a good role model for her child, and that's extremely important in this Court's mind . . . [Mother also] disagrees with the characterization that she has placed her daughter at risk in any way."  According to the court, Tessa's internet usage was very concerning and placed her at risk, and Mother's failure to acknowledge that was a big problem.  Although Mother disagrees with the court's recall of much of Dr. Ciocca's testimony, the court stated that Dr. Ciocca felt Mother was manipulating Tessa.  The court determined that "a great deal of [Tessa's] depression comes from the teasing on Mother's part" when she discusses living in Atlanta with Tessa.

In sum, the trial court, addressing Mother's counsel, stated:

Ms. Butler, I don't believe your client believes that she has done anything wrong at all, and that scares the heck out of this Court because these children are in a precarious future, path, and I will not allow, on my watch, anyone to manipulate this child, Tessa I'm speaking of, to her own detriment, to her own danger.

16

So I have to balance that with what I think is the need for her to be around her mother. I will allow -- I'm going to continue the supervised visitation.

As set forth above, the trial court in this case was charged with using the factors from Tennessee Code Annotated sections 36-6-406 and 36-6-106(a) to determine whether there was a material change in circumstances affecting the Children's best interests. While the court's failure to specifically name each factor and articulate a finding with respect to it is not fatal to its analysis, we cannot determine from the trial court's ruling on October 12, 2015 or February 24, 2016, that it sufficiently considered the proper factors to guide its decision of whether modifying the parenting plan was in the Children's best interest. In closing arguments, counsel for Father did reference Tennessee Code Annotated section 36-6-106 and correctly stated that the existence of physical or emotional abuse is a relevant inquiry for the court when determining whether it is in the best interest of the Children to modify the parenting plan. However, it appears that this was the only time anyone specifically considered any of the factors set forth in 36-6-106(a). Arguably, the court did consider some elements of factor number (6) by acknowledging that the Children need their Mother, and factors (8) and (11) in the court's admonishment of Mother's breaking the court's and Exchange Club's rules and speaking with Tessa about her new home in Atlanta. Nevertheless, we conclude that these findings by the trial court do not constitute a sufficient analysis of the factors relevant to determining whether modification of a parenting plan was in the Children's best interest under Tennessee Code Annotated section 36-6-106.

Our review of the record shows that there was a great deal of confusion about the steps for the trial court to take in determining whether to modify the existing parenting plan. If the trial court had properly considered the factors in Tennessee Code Annotated section 36-6-106 and determined that there was in fact a material change in circumstances affecting the Children's best interests, it would then have been proper to consider *how* to modify the parenting plan, if at all. It seems, however, that this step was confused and consolidated with the analysis of *whether* to modify the parenting plan.

Further complicating matters was Father's request to severely restrict Mother's visitation under the modified parenting plan and require it to be supervised. To that end, much of the parties' and the court's focus was on whether or not Father had met his burden of proving that Mother's conduct warranted imposing supervised parenting time. For example, the following exchange took place during the trial court's ruling in the October 12, 2015 hearing:

MS. BUTLER:     Your Honor, there has to be substantial harm to restrict

her parenting time to supervised visits.

THE COURT: . . . . What I'm saying is that I am required to take in    the whole picture and that is only one small portion of that.

. . . the statute is very clear, and if you look at the statute concerning - - restrictions in temporary or permanent parenting plans, . . . certainly there's no willful abandonment; there's no physical, sexual abuse.

(Reading)  . . . - - well, let me - - 36-3-406(2)(b) . . .

(Reading) The parent's residential time with the child shall be limited if it is determined by the Court, based upon a prior order or other reliable evidence, that the parent resides with a person - -

No, no, no.  I'm sorry.  That's not the one I'm looking for.

Tennessee Code Annotated section 36-6-301 allows for supervised visitation on a finding that visitation is "likely to endanger the child's physical or emotional health," or that the parent has "physically or emotionally abused the child." Tenn. Code Ann. § 36-6-301.  Supervised visitation may also be warranted consistent with findings pursuant to Tennessee Code Annotated § 36-6-406.  Finally, a trial court may also consider the child's safety and any risk of substantial harm posed by a parent in a best interest analysis under Tennessee Code Annotated § 36-6-106.  The trial court in this case did not properly analyze these relevant statutes when imposing rather severe restrictions on Mother's visitation.

On appeal, Father argues that examples of Mother's irresponsible/dangerous conduct warranting supervised visitation include Mother's lack of supervision over Tessa's internet usage, Tessa's postings on social media sites and uploading makeup tutorials, Mother not telling Father directly about Tessa's "suicide note," although even Dr. Harris testified that Tessa was not a threat to herself, Mother not following the Exchange Club's rules during supervised visits, *e.g.,* giving the Children gifts on no-gift days, and manipulating Tessa into wanting to live with her Mother.  Based on our entire review of the record, we cannot agree that these occurrences rise to the level necessary to impose supervised visitation.  Even if the trial court had properly completed the first steps in its analysis, the evidence does not support the finding that Mother is a threat to Tessa's wellbeing.  We also conclude that the remaining allegations made by Father, which were predominantly adopted by the trial court, do not rise to the level required for the trial court to limit Mother's parenting time to twelve hours of supervised visitation every other week.

18

Discretionary decisions of a trial court are not immune from meaningful review on appeal and must be based on applicable law and relevant facts. *Gooding v. Gooding*, 477 S.W.3d 774 (Tenn. Ct. App. 2015). In sum, we determine that the trial court incorrectly applied the legal standard required to modify an existing parenting plan and that the record does not support the decision to impose supervised visitation. We therefore vacate the trial court's orders and parenting plan restricting Mother's parenting time.

### Trial Court's Award of Attorney's Fees to Father

Tennessee Code Annotated section 36-5-103(c) allows a plaintiff to recover from a defendant reasonable attorney's fees in a suit concerning the adjudication of child custody. Because the trial court granted Father's petition to modify the parties' parenting plan, the court also awarded attorney's fees to Father incurred in pursuing the restriction of Mother's parenting time.

This Court has held that "'[w]here the parenting arrangement on which the award of fees is based is reversed on appeal, it is seldom proper to affirm the award of attorney's fees.'" *Mashburn v. Mashburn*, No. E2015-01173-COA-R3-CV, 2016 WL 3639495, at *11 (Tenn. Ct. App. June 30, 2016) (*no perm. app. filed*) (quoting *Miller v. Miller*, 336 S.W.3d 578, 586 (Tenn. Ct. App. 2010)). Mother has been entirely successful on this appeal in challenging the restriction of her parenting time, which Father pursued relentlessly for more than two years. Moreover, in addition to her own attorney's fees, Mother has been required to pay for the cost of her Rule 35 evaluation and thousands of dollars to exercise supervised visitation with her Children throughout this protracted litigation. We reverse the trial court's award of attorney's fees to Father.

### Mother's Request for Attorney's Fees on Appeal

The determination of whether to award attorney's fees on appeal is within the sole discretion of the appellate court. *Moses v. Moses*, E2008-00257-COA-R3-CV, 2009 WL 838105, at *10 (Tenn. Ct. App. Mar. 31, 2009) (*no perm. app. filed*) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). After considering Mother's request for this Court to award her attorney's fees incurred on appeal, we decline to do so.

### IV. CONCLUSION

For the foregoing reasons, we vacate the order of the trial court restricting Mother's parenting time, reverse the trial court's award of attorney's fees to Father, and we reinstate the parties' Original Permanent Parenting Plan. We deny Mother's request

for attorney's fees incurred on appeal.  Costs of this appeal are taxed to the Father, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE