IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 7, 2017 Session

## TRAVIS DANIEL WOOLBRIGHT v. LEE ANNA WOOLBRIGHT

**Appeal from the Circuit Court for Putnam County**
**No. 2015-CV-095      Amy V. Hollars, Judge**

_____

### No. M2016-02420-COA-R3-CV

_____

In this appeal, a father challenges the trial court's award of equal parenting time to the child's mother. The father contends that he should be awarded more parenting time because the majority of the statutory best interest factors weigh in his favor and he provides the child more stability. We have reviewed the record and find that the trial court did not abuse its discretion in awarding equal parenting time to the parties.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, and W. NEAL MCBRAYER, JJ., joined.

Michael Savage, Livingston, Tennessee, for the appellant, Travis Daniel Woolbright.

Lee Anna Woolbright, Cookeville, Tennessee, Pro Se.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

Travis Daniel Woolbright ("Father") and Lee Anna Woolbright ("Mother") were married on October 27, 2013. They have one child from the marriage, Jameson, born in August 2013. Mother also has a child from a previous relationship, Jackson, born in July 2011. In early 2015, Mother began an affair with Levi Altura.[1] Shortly thereafter, the parties separated. After approximately one and one-half years of marriage, Father filed for divorce on the grounds of irreconcilable differences and inappropriate marital conduct. Mother filed an answer and counter-complaint for divorce based on the same grounds.

_____
[1] Mr. Altura's name also appears in the record as "Levy Altura."

Both parties worked during the marriage. Mother works as a store manager for Dollar General. Early in the marriage, her work schedule required her to work late hours because she was the manager for the closing shift; however, she now works the early shift and is home between 3:00 p.m. and 4:00 p.m. Father works for his family's business, Woolbright's Garage Doors, and generally works from 6:30 a.m. until 2:30 p.m.

After filing the complaint, Father filed a motion for pendente lite relief. The record does not include Father's motion, but the trial court's order entered on June 17, 2015, states that the court heard the motion on June 3, 2015, and that it pertained to establishing a temporary parenting plan and child support. The trial court designated Mother as the primary residential parent, granted both parties equal parenting time, and ordered Mother to pay $31 per month in child support. The trial court based its decision, in part, on the fact that Father had refused to allow Mother to exercise parenting time at her home because she resided with Mr. Altura. The trial court found that Father's actions were "not a good example of facilitating a good relationship with the Mother." The trial court noted that Mother's "relationships with other men shows instability."

The parties were scheduled to attend mediation on August 6, 2015. Both parties arrived for the scheduled mediation; however, it did not occur because Mother refused to participate. Before leaving the mediation, Mother informed Father in writing that she intended to relocate to Illinois. On August 28, 2015, Father filed an objection to Mother's relocation and requested that the trial court grant an ex parte temporary restraining order enjoining and restraining her from removing Jameson from Tennessee. The trial court granted the ex parte restraining order on September 23, 2015. Father's divorce complaint was scheduled for a hearing on October 2, 2015. Mother moved to Illinois without Jameson one week before the scheduled hearing.

October 2, 2015 Hearing

Father testified that he has worked for Woolbright's Garage Doors since 2001. He stated that he lives with his parents and does not plan to move in the near future. The home he shares with his parents is large enough to allow Jameson his own bedroom. According to Father, his parents are very supportive and help him with Jameson. Specifically, while Father is at work, Jameson stays with Father's mother. He explained that, although his mother provided some assistance by taking care of Jameson while Father is at work, he does not rely on her to provide the necessary care for Jameson after returning home from work. Father feeds, clothes, and bathes the child. Furthermore, he takes the child to medical appointments, sick-baby appointments, and well-baby appointments. Father stated that he wanted the child to be able to communicate with Mother while she resides in Illinois. In regard to Mother's move to Illinois, Father testified that she did not tell him when she was moving. He learned of her move when two people called to tell him that there was a moving truck parked in front of Mother's residence. Father drove to Mother's home and watched Mr. Altura load Jameson's

belongings onto the moving truck. Finally, Father testified that he had received no child support payments from Mother.

Mother testified at the hearing as well. She testified that she provided the necessary care for Jameson, such as diaper-changing and bathing. She stated that she had steady employment as a store manager for Dollar General. She admitted that she moved to Illinois prior to the hearing because she accepted a position managing a Dollar General in that area. According to Mother, the new position paid $8,000 more per year than the position she held in Tennessee and could potentially advance her career. She explained that the job was in a store that had "fallen behind" and, if she improved that store within one year, she could enroll in human resource ("HR") training in Chicago. After receiving the HR training, she could advance to an HR position within Dollar General. She stated that she could receive the HR training at the same time she worked as a store manager. Furthermore, there was a daycare for the child to attend located in the same complex as the store where Mother works. In regard to her son Jackson, Mother testified that there was no custody or visitation order in place. She and Jackson's father "work together" so he can visit Jackson as much as possible. Mother further testified that Jackson currently lived with his father but would soon be joining her in Illinois. She thought it was important for her children to be together.

Mother admitted to having an affair with Mr. Altura. She testified that he is from Illinois and is, in fact, still married to a woman in Illinois. Following the pendente lite hearing, Mr. Altura returned to Illinois for a brief time. Mother stated that he moved back to Tennessee, however, so they could "further their relationship." Mr. Altura moved to Illinois with her when she accepted the new manager position and the two were living together at the time of the hearing. Mother testified that Mr. Altura and his wife were working on obtaining a divorce but had to wait "on their taxes so that they could pay the court." According to Mother, she and Mr. Altura planned to marry once they both obtained divorces. Finally, Mother testified that Mr. Altura had a good relationship with Jameson: Jameson responds well to him and "they play together."

The trial court entered an order titled "Final Order and Decree of Divorce" on November 17, 2015. In this order, the trial court declared the parties divorced, designated Father as the primary residential parent, and incorporated a parenting plan that provided equal residential parenting time to the parties. The trial court conducted a best interest analysis applying the factors found in Tenn. Code Ann. § 36-6-106(a), which we will discuss in further detail later in this opinion. Due to the distance between the parties' homes, the day-to-day schedule provided for the child to be with one parent for three weeks and then switch to be with the other parent for three weeks. The trial court stated at the bottom of the order that "the parenting schedule will be reviewed by the Court in March, 2016." When the trial court did not review the parenting schedule in March 2016,

Father filed a motion to modify the parenting plan[2] on April 5, 2016. The trial court heard Father's motion on August 25, 2016.

## August 25, 2016 Hearing

The trial court again heard testimony from Mother and Father. Mother testified that, one week prior to the hearing, she had moved back to Tennessee with her newborn child from her relationship with Mr. Altura. According to Mother, Mr. Altura had not returned to Tennessee at that time but would join her once he worked out his two-week notice with his Illinois employer. When asked about her current living situation, Mother responded that she lives with her sister. Mother explained that twelve people will be living in her sister's four-bedroom home. The twelve people who will be living in the home include: Mother, Jameson, Jackson, Mr. Altura, her child with Mr. Altura, her sister, her sister's husband, her sister's three children, and her parents. Mother testified that the crowded living situation was temporary and that she and Mr. Altura planned to find separate housing.

Despite the fact that she was divorced, Mother admitted that she still had not married Mr. Altura because he had not yet obtained a divorce from his current wife. Mother testified that she still worked for Dollar General but was on maternity leave at the time of the hearing. She stated that, when she returned to work, she would have the same job she had prior to her move to Illinois. She could not advance to an HR position because she did not receive the HR training as planned. Mother explained that, after moving to Illinois, she realized that the HR training would require more work and she "was already having to work so much." She stated that she decided her family was more important to her. In regard to Jackson, Mother testified that he did not move to Illinois with her as originally planned because she and Jackson's father decided it would be best if he remained in Tennessee so he would not need to change pre-schools. Finally, she admitted that she was behind on her child support payments but explained that it was due to her being on maternity leave. She testified that her payments to Father would resume once she returned to work.

Father dedicated much of his testimony to showing that he provided more stability for the child than Mother. For instance, he stated that he is in a stable environment and has been in a stable environment almost all of his life. In regard to his consistency, he

---

[2] At the August 25, 2016 hearing, Father's counsel stated that the motion probably should have been for a change pending the review rather than for a modification. We agree. Once a trial court incorporates a permanent parenting plan into a final divorce decree, the parties must comply with the parenting plan unless or until it is modified by a court. *Armbrister v. Armbrister*, 414 S.W.3d 685, 697 (Tenn. 2013). It is clear from reading the November 17, 2015 order, however, that the parenting plan was not intended to be a final adjudication of custody because the trial court ordered that the parenting schedule be reviewed in March 2016. Therefore, the trial court correctly considered the matter as an initial custody determination rather than a request for modification.

testified that "[y]ou can almost base the days, you know what's going to happen because I stay consistent. If I tell [Jameson] I'm going to do something, that's how it goes." Father further testified that he still lived with his parents and worked at the same job he has worked at for fifteen years. He stated that Mother, on the other hand, has moved four or five times "in the last couple of years." He expressed concerns regarding whether Mother would do the things she told the trial court she would do because "she changes whenever she gets it in her mind that, you know, she doesn't like something. . . . when she gets to a point, she puts up a wall. And that's it. And it's just, it's on to the next thing then." Father testified that he spends time with the child on the weekends either fishing or going to caves.

The trial court issued its ruling from the bench, which it adopted and incorporated into its order entered on November 4, 2016. In its order, the trial court also adopted and reincorporated all findings contained in the November 17, 2015 order. Because the court did not re-examine primary residential parent status, Father remained the primary residential parent. The court, however, found that Mother's move back to Tennessee warranted a re-examination of the parenting schedule. Based on the proof presented at both hearings, the trial court again granted the parties equal parenting time. The new day-to-day schedule, however, provided for the child to be with one parent for one week and then switch to the other parent for a week. The court found that both parents have a loving relationship with the child, have a good disposition to provide the child with necessities, and are physically, mentally, and emotionally fit to care for the child. The trial court found that Father's home did provide more stability but stated that Mother was in a stronger position to co-parent now and her move back to Tennessee "allows her a greater family network of support." Father appeals.

On appeal, Father presents three issues for our review. Those issues can be consolidated into one issue and restated as follows: whether the trial court abused its discretion in awarding an equal amount of parenting time to Mother.

STANDARD OF REVIEW

Our review of the trial court's findings of fact is de novo with a presumption that the findings are correct unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). Evidence preponderates against the trial court's findings of fact when it "support[s] another finding of fact with greater convincing effect." *Hopwood v. Hopwood*, No. M2015-01010-COA-R3-CV, 2016 WL 3537467, *4 (Tenn. Ct. App. June 23, 2016) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000)). We review a trial court's conclusions of law de novo, according them no presumption of correctness. *Armbrister*, 414 S.W.3d at 692; *Rigsby v. Edmonds*, 395 S.W.3d 728, 734 (Tenn. Ct. App. 2012).

Trial courts have "broad discretion" when making custody and visitation determinations. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). As the Tennessee Supreme Court has explained:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley,* 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit,* 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt,* 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge.'" *Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards,* 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge,* 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski,* 350 S.W.3d 99, 105 (Tenn. 2011).

*Armbrister*, 414 S.W.3d at 693. Thus, we will not find that a trial court abused its discretion in establishing a parenting plan unless the trial court's ruling "'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Id.* (quoting *Eldridge*, 42 S.W.3d. at 88).

ANALYSIS

Father argues that the trial court abused its discretion in awarding Mother an equal amount of parenting time with the child. Specifically, he argues that the parenting plan is illogical and inconsistent with the best interests of the child.

When making a determination regarding a residential parenting schedule, the court must base its decision on the best interests of the child. Tenn. Code Ann. § 36-6-106(a). To determine a child's best interests, court's are directed to fashion a custody arrangement that allows "both parents to enjoy the maximum participation possible in the life of the child" in accordance with the factors enumerated in subdivisions (a)(1)-(15), "the location of the residences of the parents," and "the child's need for stability." *Id.*;

- 6 -

*see also* Tenn. Code Ann. § 36-6-401(a) ("The general assembly recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests.").

The trial court's November 17, 2015 order reflects that it considered the factors listed in Tenn. Code Ann. § 36-6-106(a), and the November 4, 2016 order adopted and incorporated the trial court's findings relating to these factors. With regard to the child's best interest, the trial court stated as follows:

> The Court makes the following findings upon application of the statutory factors set forth in Tenn. Code Ann. § 36-6-106:
>
> 1) Both parents share a strong relationship with the minor child. Both parents have been present in the child's life and have, until the point of separation, worked together to care for and support. This factor regarding the strength, nature, and stability of the child's relationship with each parent favors each parent equally.
>
> 2) Both parents have a good potential for future performance of parenting responsibilities with regard to their minor child, Jameson. Both are hard working and are committed to the child and his well-being. However, the court finds that both parents have, since their separation, failed at times to demonstrate a willingness and an inclination to facilitate and encourage a close and continuing relationship between Jameson and the other parent. [Father] unilaterally denied [Mother] contact with the child for a period of several weeks, after he learned that [Mother] was in a romantic relationship with Levy Altura. This action by [Father] was an unwarranted and unauthorized interruption of the mother's contact with Jameson.
>
> Additionally, [Mother] has, by taking a job transfer and moving to the state of Illinois created a situation in which continued and regular contact with [Father] will be more difficult. The court observes that the proof did not indicate that this move was the only opportunity for advancement within [Mother's] company. Rather it appears to be a decision taken rather hastily based upon [Mother's] desire to live with Mr. Altura in Illinois. This move was not disclosed to or discussed with [Father] before he was alerted to the presence of a moving truck at [Mother's] apartment. This action by [Mother] does not demonstrate a willingness to foster a close and continuing relationship with [Father]. This factor regarding facilitation of the parent-child relationship weighs against both parents, but slightly more heavily against [Father].

3) The factor set forth in Tenn. Code Ann. § 36-6-106(a)(3) does not apply here.

4) Both parents demonstrate a disposition to provide the child with food, clothing, medical care, education and other necessary care, under the factor set forth in Tenn. Code Ann. § 36-6-106(a)(4). Both parents are hard working and have contributed to providing for these basic needs of the child through maintaining steady employment and working together to care for Jameson and his half-brother, Jackson, when not at work. While [Mother] was somewhat behind on the payment of child support at the time of the hearing, the amount of the arrearage ($186.00) was modest and mother expressed the ability and desire to satisfy that obligation. The court does not find that the fact that [Mother], at the time of the trial, owed this small amount of child support, indicates any real lack of disposition to provide for the child. The factor weighs equally in favor of each parent.

5) Both parents have contributed significantly to the daily, hands-on care of the child and have shared responsibilities for performing caregiving duties such as feeding, bathing, and providing supervision for this young child. Because [Mother's] hours as a store manager have, on certain days, been quite long, [Father] has made significant contributions as a caregiver. The court also observes that [Father] has had the assistance of his mother in this regard, since the parties resided with [Father's] parents. This factor weighs equally in favor of both parents.

6) Both parents have developed ties of love, affection, and emotional closeness to the child.

7) Jameson is just over two years old, and both parents are capable of meeting his emotional and development[] needs. In the interest of preserving a continuing and close relationship with each parent, the court finds that it would not be beneficial to this young child to remain apart from either parent for lengthy periods of time (i.e., only seeing one parent in the summer or on holidays). This factor weighs equally in favor of both parents.

8) The court finds that both [Father] and [Mother] are physically, mentally, and emotionally fit to parent their son, Jameson. [Father] questions [Mother's] moral fitness because of the fact that she began an adulterous relationship with Mr. Altura some months before the parties separated. Additionally, proof indicated that Mr. Altura is a married man with three children, and he is currently going through a divorce, which has not been finalized in Illinois. The court observes that [Mother] has not

been candid with this court about the nature of her relationship with Mr. Altura during earlier hearings. While [Mother's] affair undoubtedly undermined the stability of Jameson's homelife, this Court does not find her to be morally unfit to parent her son. The subfactor of comparative moral fitness weighs somewhat in [Father's] favor.

9) The factor set forth in Tenn. Code Ann. §36-6-106(a)(9) regarding the child's interactions and interrelationships with siblings and other relatives, and the child's involvement in other significant community activities weighs in favor of [Father]. . . . The child developed significant relationships with his grandparents, and especially with his grandmother Woolbright who provided child care while both parents were at work. The grandparent[s'] home has been the only home Jameson has known until after the separation. . . . [Mother] has another child, Jackson Webb, by another relationship, . . . who is also pre-school age. [Mother] testified that Jackson would be accompanying her to Illinois. If the mother relocates Jackson, then Jameson's contact with his half-sibling would be reduced.

[Mother] will not have any meaningful family support network when she moves to Illinois. Additionally, the surroundings will be unfamiliar to Jameson, as will be the new contemplated daycare arrangement in Illinois. This factor weighs in favor of [Father].

10) "The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment" is another factor weighing in [Father's] favor. [Father's] home situation . . . offers stability and familiarity to this young child. [Mother's] home situation provides comparatively less stability. Mother testified that she had to move to Illinois and take over as the manager of a faltering store, and that she will be there for one year. After that year, hopefully turning around the store, she will be eligible to enroll in the company HR training program in Chicago. While [Mother] shows laudable initiative to better her earning power, it appears to his Court that the chief motivation for accepting this job transfer is to be with Mr. Altura in Illinois. This rather drastic move, undertaken at least largely to promote a relationship with relatively shallow roots, does not demonstrate a commitment to stability and continuity for the child. Mother has testified that she will marry Mr. Altura as soon as both divorces are final. Therefore, she does plan to establish a more stable family unit.

11) There is no credible evidence of physical or emotional abuse to Jameson. Hence, the factor set forth in Tenn. Code Ann. § 36-6-106(a)(11) does not apply.

- 9 -

12) "The character and behavior of any other person who resides in or frequents the home of a parent" is another factor which must be considered. [Father] brought forth no proof that Mr. Altura is a threat of any harm to Jameson. [Mother] testified about a positive and warm relationship between Mr. Altura and Jameson. This factor does not weigh against [Mother].

13) It is anticipated that [Mother] will be working hours similar to those she worked as the manager of the Dollar General in Cookeville. [Father] is employed in a family business and may have greater flexibility. This factor weighs slightly in [Father's] favor.

Father contends that the residential parenting schedule is illogical and inconsistent with the best interests of the child because "the majority of the factors set forth in Tenn. Code Ann. § 36-6-106 clearly weigh in [Father's] favor" and "the plan does not take into account the child's need for stability." A thorough examination of the trial court's application of Tenn. Code Ann. § 36-6-106 to the facts of the case shows that while four of the best interest factors weigh in Father's favor, five weigh equally in favor of both parties and one weighs slightly more against him. Thus, Father is incorrect in his assertion that the majority of the factors clearly weigh in his favor. Even if a majority of the factors did weigh clearly in favor of Father, that would not necessarily mean that the trial court abused its discretion by awarding an equal amount of parenting time to each parent. As this Court has previously stated:

> Determining a child's best interest is a "fact-sensitive inquiry" that does not call for "rote examination of each of the [relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case."

*In re William K.*, No. M2014-01872-COA-R3-JV, 2015 WL 6164849, at *3 (Tenn. Ct. App. Oct. 20, 2015) (quoting *Solima v. Solima*, No. M2014-01452-COA-R3-CV, 2015 WL 4594134, at *4 (Tenn. Ct. App. July 30, 2015)).

The trial court relied on proof presented at the October 2, 2015 and August 25, 2016 hearings to determine that equally dividing residential parenting time was in the child's best interest. The trial court found that both parents had a strong relationship with the child; each parent had developed emotional closeness with the child; both parents demonstrated a disposition to provide the child with the necessaries of life; and both parents had contributed significantly to the caregiving responsibilities for the child. The trial court further found that keeping the young child apart from either parent for lengthy periods of time would not be beneficial to the child because it would not preserve a "continuing and close relationship with each parent." A thorough examination of the

- 10 -

record shows that the parties' testimonies supported the court's observations. Thus, we cannot conclude that the trial court abused its discretion merely because four of the best interest factors weighed in favor of Father.

We turn now to Father's contention that the residential parenting schedule is illogical and inconsistent with the best interests of the child because it "does not take into account the child's need for stability." Specifically, Father argues that Mother's move to Illinois and her move back to Tennessee do not indicate that she will meet the child's need for stability. Having reviewed the trial court's October 2, 2015 order, it is clear that the trial court considered Mother's move to Illinois as it related to the child's need for stability. The court, in fact, stated that her move to Illinois did not demonstrate a commitment to stability for the child because it was "drastic" and was "undertaken at least largely to promote a relationship with relatively shallow roots." In its November 17, 2016 ruling, the trial court again considered Mother's move to Illinois in addition to her recent move back to Tennessee. Although the trial court found that Father offered more stability at present, the court pointed out that Mother's move back to Tennessee improved her position. The court found that Mother's move back to Tennessee provided her with a "greater network of support" and placed her in a stronger position to co-parent. The court stated that Mother was living in a "somewhat crowded" home but credited her testimony that the living situation was temporary and that she would seek separate housing when possible. The evidence in the record before us does not preponderate against the trial court's findings.

We conclude that the trial court did not abuse its discretion in devising a residential parenting schedule that allows both parties "to enjoy the maximum participation possible in the life of the child." Tenn. Code Ann. § 36-6-106(a). The result the trial court reached is not outside the spectrum of rulings that reasonably results from applying the correct legal standards to the evidence. We, therefore, decline to "tweak" the residential parenting schedule "in the hopes of achieving a more reasonable result than the trial court." *Eldridge*, 42 S.W.3d at 88.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Travis Daniel Woolbright, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE